## PEOPLE *v.* WALKER.

HOMICIDE—FIRST-DEGREE MURDER—CONFESSION—EQUALLY DIVIDED
  COURT.
    Conviction of defendant of murder in the first degree, obtained
      at trial during which a confession had been admitted in evi-
      dence, is affirmed by an equally divided court (CL 1948,
      § 750.316).

Appeal from Recorder's Court of Detroit; Ricca (John A.) J. Submitted May 8, 1963. (Calendar No. 57, Docket No. 49,789.) Decided December 2, 1963. Rehearing granted February 3, 1964.

Lee Dell Walker was convicted of first-degree murder. Affirmed by an equally divided court.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Samuel H. Olsen,* Prosecuting Attorney, *Samuel J. Torina* and *Angelo*

REFERENCES FOR POINTS IN HEADNOTE
26 Am Jur, Homicide § 382 *et seq.*

*A. Pentolino,* Assistant Prosecuting Attorneys, for
the people.

*Albert Best,* for defendant.

*Amicus Curiae:*

American Civil Liberties Union of Michigan, by
*Rolland R. O'Hare,* Chairman, *Erwin R. Ellmann,*
General Counsel, and *Donald H. Gordon.*

O'HARA, J. (*for affirmance*). On June 28, 1954, Lee
Dell Walker was convicted of murder in the first
degree* by a jury empaneled in the recorder's court
of the city of Detroit. Thereafter on July 12, 1954,
he was sentenced to life imprisonment without
recommendation. On March 15, 1962, an order was
entered in this Court granting him leave to file
delayed appeal from his conviction. On July 11,
1962, the order granting leave was modified by per-
mitting appeal on a typewritten brief and appendix.
Transposing statements of questions involved to
claims of error, they are as follows:

The court erred:

(1) In admitting into evidence defendant's con-
fession because it was obtained 3 days and 20 hours
after his arrest;

(2) In failing to instruct the jury that the prose-
cution did not meet its burden of proof of the volun-
tariness of the confession;

(3) In injecting the element of truth or falsity of
the confession in its instructions;

(4) In failing to instruct the jury that it could
consider: (a) The length of detention and interro-
gation between arrest and confession, (b) The
statutory duty of the police requiring an accused to

---

* See CL 1948, § 750.316 (Stat Ann § 28.548).—REPORTER.

be brought before a judicial officer without unnecessary delay;

(5) In refusing the jury's request to have excerpts of testimony read, and remarking "I don't mean to be stern or anything, but I don't see anything so very difficult about this case;"

(6) In referring to the fact that defendant did not take the witness stand;

(7) In denying a motion for a new trial (no specific grounds included).

The foregoing wording is basically appellant's.

This cause was originally docketed without request for oral argument by defendant. *Sua sponte* this Court directed resubmission with argument by defendant. A motion to strike certain specified material was made and granted and it is not considered herein. Leave was granted the American Civil Liberties Union of Michigan to file a brief amicus curiae. Letters were directed to our clerk calling our attention to cases decided since the argument before us, and we have noted them. A communication *in propria persona* objecting to an extension of time to appellee to answer the *amicus curiae* brief is acknowledged, as is a letter objecting to alleged extrarecord material in appellee's reply to the *amicus curiae* brief.

Before embarking upon decision proper in the case at bar certain observations are indicated by reason of the manner in which the statement and counterstatement of facts were prepared.

It is contended by the appellee that extra-record material was included in appellant's appendix. Instead of moving to strike in the manner provided by rule, appellee chose to add more admittedly extrarecord material. As noted, by order of this Court all extra-record material was ordered stricken and it has not been considered. The result of the charges and countercharges, unbecoming at best in appellate

procedure, this Court has been required to make a microscopic examination of over 500 pages of trial transcript and a bulky supplemental record made on motion for a new trial and for delayed appeal, in 1 of which additional testimony was taken. The total record then had to be cross-referenced to the excerpts quoted and objected to in the appendices.

We deplore the practice employed in this case and suggest that we are not without means of dealing summarily with such travesties upon prescribed procedure. Only the nature of the case constrained us not to invoke them.

To all and each of the errors claimed we have applied ourselves. Meritorious and controlling are 2:

(1) Was defendant's confession inadmissible as a matter of law, and thus reversibly erroneously admitted?

(2) Did the trial court err, when in denying the jury's request for the reading of excerpts from the testimony, he added: "I don't see anything so very difficult about this case"?

To consider the first question, the following factual background is requisite. On February 17, 1954 a Detroit shopkeeper was shot and killed in his place of business in the course of an attempted holdup. Present at the time were deceased's wife and a 17-year-old helper in the shop, Robert Hines. In the course of the police investigation Hines indicated he believed he could identify the holdup men. Routine police investigation ensued. Up to this point defendant was not—so far as the police knew—remotely connected with the affair. On Friday, March 26th, he reported his car stolen to the Detroit police by telephone. The police refused to accept the phoned report. On the day he reported the alleged theft and for reasons we may not discuss and which are not to the purpose of the precise legal question

presented, he was arrested "on information" (trial transcript p 207) by plain-clothes police detectives of the holdup bureau, at between 4 and 4:30 a.m. He was brought to headquarters and confined in the Wayne county jail. This was a Saturday. Meanwhile, and on the same day, the automobile which he had telephonically attempted to report as stolen the night before, had been recovered on the street by the Detroit police. They impounded it and in checking the motor number found a 32-caliber revolver wrapped in cloth wedged against the container for windshield wiping fluid. Defendant was held in custody from his arrest on Saturday morning without a charge being perferred until 2 p.m. the following Monday, March 29th, at which time a hearing on a writ of habeas corpus was had in circuit court. Because of its importance to the issue of alleged unlawful detention as it bears upon his later-made confession, the proceeding on the return on the writ is herewith set out:

"STATE OF MICHIGAN
"IN THE CIRCUIT COURT FOR THE
COUNTY OF WAYNE
"In the Matter of the Petition for a Writ of Habeas Corpus in behalf of LEO WALKER*
"Before the Honorable Miles N. Culehan,
Circuit Judge,
March 29, 1954, 2:00 p.m.
*"Appearances:*
"Edgar A. Beauchamp, Esq. for petitioner.
*"Mr. Beauchamp:* I brought this petition, your Honor. He was arrested, I understand, Saturday morning, and I talked to Inspector Fox Saturday afternoon. He said they wanted to hold him for some show-ups on a robbery armed matter in which his car was involved. Now I just heard that he had a traffic violation that resulted in the suspension of

---

* An obvious typographical error.

his license, and, because of that, his parole is presumed to have been violated for not reporting it. At any rate, he has been in there over the week-end. Whether or not they have made any progress on the charge, I could not say.

"*The Court:* The man on parole is in jail?

"*Mr. Beauchamp:* As I say, I just found that out.

"*The Court:* As far as the parole department is concerned he is out; and he is not out if they want to put him back in.

"*Parole Officer:* We are going to take him as a parole violator and hold him if the police are done with him.

"*Police Officer:* We have a man who is to come in and view him in a show-up—a witness, who will be in some time this evening to look at him.

"*The Court:* If he is held by the parole department, I do not have any jurisdiction. As long as you have found out now what he is held for—

"*Mr. Beauchamp:* Well, if the parole department had him under that situation, I can understand that is the end of it. I did not know it before.

"*The Court:* Writ dismissed."

Whatever violation of defendant's constitutional rights may be claimed to have occurred in the interlude between his arrest early Saturday morning and his appearance before the circuit court Monday afternoon, they cannot bear upon the voluntary character of his later confession under the theory urged by defendant that it was inadmissible as a matter of law by reason of the holding in *People* v. *Hamilton,* 359 Mich 410, and its Federal antecedent, *Mallory* v. *United States,* 354 US 449 (77 S Ct 1356, 1 L ed 2d 1479).

In *Hamilton,* counsel engaged for the defendant was refused "even limited conference" with him. Here defendant not only was represented by counsel but his alleged illegal detention was tested by the historic safeguard of habeas corpus. As the return

makes clear, defendant was in custody of the parole department, and the court, with counsel's acquiescence, determined his detention and confinement as of that time was lawful.

We pick up now the chronology after Monday, March 29th, at 2 p.m. Admittedly, later in the day on Monday, periodically on Tuesday and again at intervals on Wednesday, defendant was questioned by Detroit police detectives. He was, with other accuseds, put through "show-ups" for possible identification.

The record does not disclose, and we may not speculate on what, if any, objection was made by or on behalf of defendant to his continued confinement after his remand to custody by the circuit judge on habeas corpus. It was prima facie legal. No appeal was sought from the circuit judge's action. The illegal confinement without charge and arraignment which rendered the confession in *Hamilton* inadmissible as a matter of law is not paralleled here. *Hamilton* and those Federal cases of similar legal rationale are not applicable. There does arise a different question. Was defendant, while prima facie legally confined, in fact abused, brutalized, coerced, mentally or physically, thus rendering his alleged admissions and formal confession inadmissible? This question is soluble under well-established precedent, State and Federal. It is fundamental that the burden of proving any admission or confession voluntary is upon the State. This is a question of fact, submissible to the jury and when so submitted subject to the same review, by the same standards of like questions of fact in criminal cases. Here, as in virtually every such case, the officers testified to no physical or mental abuse and to the defendant's normal condition at the time of the admission and confession. To this was added the testimony of the departmental doctor who ex-

606 371 Michigan Reports. [Dec.

amined him for the admitted purpose of later possible witness appearance, and who attested to lack of signs of physical mistreatment and to his apparent mental and emotional normalcy.

As against the foregoing—in the record proper— is the testimony of Minnie Mae George who saw defendant while in custody about 7:30 on Thursday, April 1st, the day of his first alleged admission of the murder. Purportedly, defendant made the admission between 9 and 10 that morning. She testified that when she saw him he bore evidence of manifest physical abuse, broken skin, "welps" (presumably welts), and inability to bend over; that he was crying and hysterical.

The introduction of the signed confession and the officer's testimony as to the defendant's admission carried with them the State's burden of proving them to have been made voluntarily, even without the testimony of the witness George. Her testimony bore on the issue of voluntariness and was to be considered in relation thereto. The testimony of the departmental physician, and the interrogating officers, constituted the State's proof that no duress or coercion, physical or mental, was employed in obtaining them. The court adverted to neither the State's witnesses nor the defense witness specifically. He did place the issue of voluntariness before the jury as follows:

"Now, it is the claim of the defense that certain admissions or confessions were made in this case but they were not made freely and voluntarily. But that they were made as a result of force or threats or undue influence, and as a result of certain promises having been made to the defendant. If you find them to be made voluntarily, you may consider them with all the other evidence in the case. But if you find they were not voluntarily made, or if you find they were made because of hopes held

out to him or because of fear or because of induce-
ments made to him to confess, you should reject
them. Under such circumstances, no reliance should
be placed on admissions of guilt for the obvious
reason that it could not be said that they were made
because they were true, but because whether true
or false, the accused was led to believe it was for
his best interest to make them. So, members of the
jury, in considering the alleged confessions or ad-
missions testified to in this case, you will give such
testimony your careful consideration and if you find
that they were made knowingly, voluntarily and
freely, without any fear or promise of reward, then
you will give them such weight as you, members of
the jury, feel they are entitled to."

We consider the quoted excerpt properly and fairly
stated applicable law. Reference to the specific
testimony of either the people's witness, or the de-
fense witness, was not necessary.

The testimony of police officers and the depart-
mental physician stood upon the same base and was
subject to the same test of credibility as any other
testimony. No specific reference thereto was neces-
sary. It was not, as a matter of law, less credible
than any other testimonial evidence. Courts are
ever alert to the constitutional rights of accuseds.
Against all suggestion of invasion by law enforce-
ment officials, they stand as vigilant protectors.
This is not to say, however, that they must consider
the police and society antagonists and consider
police testimony suspect *per se*. As courts protect
judicially those accused of crime, law enforcement
officials in a pragmatic and often a dangerous way,
protect society against those who attempt to commit
and who do commit crime. By reason of this duty
they must investigate, they must interrogate, they
must match wits. They may and must arrest, and
may and must confine, within constitutionally pre-

scribed limits, while interrogating. Arrayed against them are those asocial elements who, while they are members of society, prey on society. As enforcement officials meet the challenge of trial in courts, they may properly expect that their own status as citizens as well as that of the accused will be respected. The testimony establishes that the question of the voluntary character of the admissions and confession of defendant was an issue of fact and not of law. It was submitted to the jury under proper instruction. No error attended its admission.

The second reviewable issue is the statement of the trial judge to the jury in respect to their written request that excerpts of testimony be read to them. The elliptical version in appendix does not present its full or fair meaning. The full statement is hereinafter set forth:

"(Jury retired to the jury room at 9:35 o'clock a.m. to commence deliberation.)

"(Jury in courtroom at 10:03 o'clock a.m.)

*"The Court:* Ladies and gentlemen, I have before me here a note from probably your foreman or someone in the jury. You people have listened to all the testimony that was given in this case. There isn't anything very difficult about it or anything else. You've heard both sides. Now, just go in there and try to arrive at a verdict. To give you any part of anybody's testimony would just be emphasizing that as against some of the other testimony. Now, you've heard the testimony of the people, you've heard the testimony of the defendant's witnesses, you've heard the testimony of all the people that had anything to do with the case. So, I am not going to read or have read to you any part of anything.

"That was your job to listen to it. I don't mean to be stern or anything, but I don't see anything so very difficult about this case.

"Now, go in there and try to agree on a verdict.
"(At 10:05 a.m., jury back in jury room to deliberate further.)"

The record does not disclose how the note reached the trial judge. Neither does its contents appear of record. We are uninformed as to whether this is a request by a single juror, or the jury's composite action through its foreman. We cannot judge whether the excerpts requested were of such nature that re-read they would have tended to emphasize prosecution- or defense-urged propositions. We are left then, with the determination first whether any prejudice to defendant resulted from the refusal itself. In that portion of appellant's argument supporting this claim of error, 2 cases are cited; 1 from this State and 1 Federal case. They hold in essence that a fair and impartial trial by jury demands the display of impartiality on the part of the trial judge. *People* v. *Cole,* 349 Mich 175, 200, and *Banning* v. *United States* (CCA 6), 130 F2d 330, 339. With this proposition little disagreement in American jurisprudence can be found. Its applicability to the precise question posed is not quite as evident. The *amicus* brief does not include this issue. Appellee refers us to *People* v. *Pizzino,* 313 Mich 97, as authority for the trial judge's action and for the following statement which we quote from the brief:

"It is within the province and sound discretion of a court to determine whether trial testimony should be read back to a jury."

Diligent reading reveals no such holding in that case. *People* v. *Chivas,* 322 Mich 384, is cited. This case deals with reading specified testimony to the jury, but the precise issue there was whether such reading *without consultation by the court with defense counsel was reversible error.* Implicit in the holding is the proposition that to read the testimony

was not error. *People* v. *Kasem,* 230 Mich 278, affirms at p 288, that it was not an abuse of discretion to permit the reading of testimonial excerpts. The converse is likewise sanctioned. We conclude that to read or permit to be read testimonial excerpts is an exercise of judicial discretion. It is reviewable, as are all such holdings, and reversible only if there was an abuse of discretion. No such abuse appears. It was not error to refuse the request.

*Kasem* is further applicable in its comments upon the remarks of the trial judge concerning the obligation of the jury to attempt to agree upon a verdict. Judge Ricca's statement has been set out in full earlier and we need not quote it again. The visceral content attacked by appellant was:

"I don't mean to be stern or anything, but I don't see anything so very difficult about this case."

At most the statement could be characterized as unfortunately phrased. There is room within the total context of the court's statement, to interpret this meaning, that the issues in the case were not unclear. As we have noted, there were disputed questions of fact and the court had charged the jury extensively and correctly on them. Certainly we may not assume, nor is there basis to conclude logically, that the court meant or, more importantly, conveyed the meaning to the jury, that it was any more or less difficult to convict than acquit. *Kasem, supra,* depended not, as here, on a transcript for the court's exact remarks but on post-trial affidavits. They averred, the court said:

"I am going to send you back to your room again and I want you to decide this case as soon as you can. It is making too much expense to the county. * * *

"It was their duty to agree on a verdict and he hoped they would do so as soon as they could, that

it had been a long trial, and to try it over again would be a great expense to the county.    *   *   *

"That it was their duty to agree upon a verdict; that it was an expensive case, and that if it had to be tried again it would be a still greater expense to the taxpayers. That he was going to send them out again and he thought they ought to be able to agree upon a verdict."

In passing on the error assigned for making the foregoing remarks, we hold in *Kasem,* at pp 289, 290:

"The court in no way intimated to them [the jury] his opinion as to the verdict they should render.   *   *   *

"In considering such questions, we are apt to lose sight of the fact that jurors are men [and women] of intelligence. They fully understand that they are not mere automatons, charged with the duty of voicing the sentiments or desires of the trial court. The majority, if not all of them, have a proper conception of their own duty, and of the duty of the court, and will not be driven to return a hasty or unjust verdict because they might think it in accord with the wishes of the court. Instructions urging agreement if the jurors could conscientiously do so, and stating that absolute certainty that their verdict was right could not be expected, were approved of in *Commonwealth* v. *Tuey,* 8 Cush (62 Mass) 1; *State* v. *Smith,* 49 Conn 376, and *Allen* v. *United States,* 164 US 492 (17 S Ct 154, 41 L ed 528).

"We have no right to reverse a conviction unless we are satisfied that there was such error committed on the trial as deprived the defendant of substantial rights or resulted in a miscarriage of justice."

Of this we are not satisfied in the instant case. Here, as in *Kasem,* the jury continued to deliberate after the judge's comment. The record indicates nearly an hour of continued consideration of the case after the incident. We do not have here, as was present in *People* v. *Warner,* 289 Mich 516, 519,

a direct reflection of the influence of the court's remarks by the return of a verdict within 10 minutes after they were made.

We have not failed to consider the concept urged, newly, so far as our settled law is concerned, that the court "eliminate any reference or comment" concerning the defendant's failure to testify. So to do would deprive defendant of the precautionary instruction that the election not to testify is an accused's privilege; that constitutionally it is guaranteed, and that no adverse inference may be drawn from the exercise of that right. We opine that jurors would be more inclined to draw an inference adverse to defendant, absent proper instruction in relation hereto.

The intensity of feeling of both counsel of record, expressed in brief and on argument, impels us to record that under the broad claim of error 7—that the court erred in not granting a motion for a new trial—we have reviewed the whole record with extreme care, and we summarize first, factually. Before defendant's arrest, the following information was in possession of the police. He had attempted to report by phone the theft of his car. Contemporaneously, from another source, was reported that a car of similar description had been used in an attempted crime. The vehicle was found on the street with the motor still warm and it was identified by a witness to the attempted crime as the getaway car. In the identification process defendant was revealed as being on parole. After his arrest, and after the car was identified as his, a revolver was found secreted under the hood. Unchallenged ballistic tests established it to be the murder weapon. Faced with the weapon, he confessed.

In legal resumé, defendant was arrested between 4 and 4:30 a.m. on Saturday, March 27th. He was

held without charge or arraignment over the weekend. Such confinement after "booking and questioning" may very well have been illegal and violative of his constitutional rights. However, on Monday, March 29th, his confinement was tested by habeas corpus. He was represented by counsel. His status as a parole violator was not questioned. No appeal from his remand to custody and dismissal of the writ was taken. On Monday, Tuesday, and Wednesday, March 29th, 30th, and April 1st he was questioned and put through "show-ups" while legally confined. His confession was obtained on Thursday, the same day he was confronted with the weapon which had been undergoing firing and bullet comparison tests. The defenses of coercion, duress, and mistreatment in eliciting the confession were raised. The issue was submitted to the jury under proper instruction. Defendant was vigorously represented by counsel of his own choice. Finding as we do no violation of constitutional rights, State or Federal, that would render defendant's confession and admissions inadmissible as a matter of law; and determining that no reversible error took place upon trial, we are constrained to hold that the order of the trial court denying defendant's motion for a new trial, which order was reviewed here on delayed appeal, should be and hereby is affirmed.

CARR, C. J., and DETHMERS and KELLY, JJ., concurred with O'HARA, J.

SOURIS, J. (*for reversal and remand*). Just 3 years ago, in *People* v. *Hamilton,* 359 Mich 410, we held unanimously that a confession obtained during a period of illegal detention of a prisoner for the purpose of interrogation was inadmissible in evidence. While it is true that in the *Hamilton Case* there was

evidence that Hamilton was "mistreated scandalously", as well as evidence that he was not, from which a jury could have found that his confession had been coerced from him, thereby rendering his confession involuntary in the narrowest sense of that term, the jury did not so find. The basis of our decision was that, in order to discourage illegal detention of prisoners for interrogatory purposes by police authorities sworn to uphold the law, admissions and confessions however obtained during such periods of illegal detention must be excluded from evidence in courts of law. That such was the rationale of our *Hamilton* decision was emphasized by our subsequent, and again unanimous, decision in *People* v. *McCager,* 367 Mich 116, where we said, at pp 118, 119:

"Two years ago, in *People* v. *Hamilton, supra,* at p 417, this Court unanimously held that 'an unnecessary and so unlawful delay of compliance with either of said sections 13 and 26[*], when done for prolonged interrogatory purposes and without proven justification of the delay, renders involuntary and so inadmissible whatever confessional admissions the detained person may have made while so unlawfully detained.'

"Thus Michigan became the first State to adopt the exclusionary principle announced in *McNabb* v. *United States,* 318 US 332 (63 S Ct 608, 87 L ed 819), which the Federal courts are required to follow. See *Culombe* v. *Connecticut,* 367 US 568, 600 (81 S Ct 1860, 1878, 6 L ed 2d 1037, 1056), footnote 53 of Mr. Justice Frankfurter's opinion; 7 Wayne L Rev 51, 60; and *People* v. *Lundberg,* 364 Mich 596, 604.

"Our decision in *Hamilton,* adopting the exclusionary principle of *McNabb,* was planted not alone on the statutory requirements cited, but also upon Michigan's own constitutional guarantee of due

---

* See footnote, *McCager,* p 119.—REPORTER.

process. Const 1908, art 2, § 16. By guarding against 'actual or inferential judicial sanction of procedures which are violative either of section 13 or section 26,' we also sought to assure an accused 'the process that is due him,' p 419."

We affirmed the trial judge's refusal to suppress McCager's confession for the reason, as noted in our opinion, that McCager's confession was given during a period when he was detained under authority of a judge who had issued and then adjourned the hearing on a writ of habeas corpus and, hence, it could not be said properly, as we did say in *Hamilton,* that McCager's confession was obtained while he was illegally in custody.

Thus it is that 3 years ago this Court aligned itself with the United States supreme court's exclusionary principle announced in *McNabb* v. *United States,* 318 US 332 (63 S Ct 608, 87 L ed 819), by barring the courts of this State from participating in official illegality not limited only to those instances in which official illegality extends to the point of physical or mental brutality or threats thereof. Such extreme official misconduct always in this State resulted in exclusion of confessions obtained thereby on the ground that they were involuntary: *Flagg* v. *People,* 40 Mich 706; *People* v. *Wolcott,* 51 Mich 612; and *People* v. *Stewart,* 75 Mich 21. In *People* v. *Hamilton,* this Court extended the bar against all confessions obtained during periods of illegal detention. Only in this fashion, as the United States supreme court long ago recognized, can free people assure themselves of their continuing freedom from police methods more compatible with tyrannical government than with our democratic processes. Mr. Justice Brandeis, dissenting in *Olmstead* v. *United States,* 277 US 438 (48 S Ct 564, 72 L ed 944, 66 ALR 376), at p 485, stated the peril thusly:

"Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent, teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a law-breaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face."

With these precepts of *Hamilton* and *McCager,* Mr. Justice O'Hara does not express disagreement. However, he holds them not applicable in this case by virtue of a habeas corpus hearing conducted during the interim between defendant's arrest without a warrant and his confession before arraignment. I do not agree that the habeas corpus proceedings invoked in Walker's behalf, as disclosed by the transcript thereof made a part of this record on appeal without objection from the prosecutor, should be given the exalted effect attributed to it by Justice O'Hara.

The complete, and very brief, transcript of that hearing is quoted verbatim in Justice O'Hara's opinion. Reference to it discloses that defendant was not then in the custody of a parole officer, as Justice O'Hara claims the record makes clear, nor was he upon dismissal of the writ remanded to the parole officer's custody. Furthermore, nothing in this entire record on appeal permits even an inference that defendant was ever thereafter in the cus-

tody of anyone other than the police until his sentence and subsequent delivery to the corrections department.

The only basis for Justice O'Hara's finding that "defendant was in custody of the parole department" is a single statement made by an unidentified parole officer present at the habeas corpus hearing: "We are going to take him as a parole violator and hold him if the police are done with him." It does not appear that the unidentified parole officer was sworn as a witness nor does it appear that the stated condition precedent ("if the police are done with him") occurred so as to invoke the parole officer's expression of future intent ("We are going to take him as a parole violator and hold him"). The most that can be said for this single statement appearing in the transcript of the habeas corpus hearing is that a parole officer indicated to the court an intention to take custody of the defendant whenever the police were done with him. From the statement of the parole officer, even as cryptic as it is, it seems clear to me that he was not asserting present custody of defendant nor was he expressing even a willingness to assume the obligations of custody until after the police advised that they were "done with him". Under these circumstances appearing of record, dismissal of the writ was erroneous and such erroneous dismissal ought not to be given the effect Justice O'Hara gives it. On the basis of the record made by the police at the habeas corpus hearing, they were not entitled to dismissal of the writ and, therefore, its dismissal cannot make defendant's continued confinement in police custody "prima facie legal" absent any other proof in this record justifying defendant's continued confinement without arraignment. I cannot close my eyes to the patent error in dismissal of the writ by treating it "as if" it had been dismissed properly. Such treatment of the

habeas corpus proceedings wraps a mantle of legality around defendant's subsequent detention and precludes the inquiry concerning such detention which the *Hamilton Case* requires be made.

From the time of his arrest in the early morning hours of Saturday, March 27, 1954 until his subsequent arraignment 9 days later on Monday, April 5th, defendant was in police custody excepting only for the very brief time his custody passed from the police to the habeas corpus judge upon return to the writ and until its summary dismissal no more than minutes later, judging from the brevity of the record of the habeas corpus proceedings. *People v. McCager,* 367 Mich 116.

Whereas in the *McCager Case* defendant's confession occurred during adjournment of a habeas corpus hearing, and thus while the defendant was in the custody of the habeas corpus judge,* Walker's writ of habeas corpus was dismissed and his confession was made thereafter while he was in police custody, not judicial custody.

Because of the erroneous dismissal of the writ of habeas corpus, Walker's case is no different from Hamilton's with respect to the admissibility of his admissions and confessions made during detention by the police after arrest and prior to his arraignment. In determining such admissibility the prin-

---

* On March 7, 1963, by order of superintending control, this Court ordered that habeas corpus proceedings to inquire into the cause of detention be conducted in all courts exercising habeas corpus jurisdiction in conformance with specified standards which were to be given the force and effect of court rules. On October 10, 1963, we amended GCR 1963, 712.17 and 712.18 to incorporate formally the specified standards into our court rules, effective December 2, 1963. Included in such standards, now part of our rules, is a prohibition against adjournment of habeas corpus hearings (as was done twice in *People* v. *McCager*) excepting "only for such brief delay as may be necessary to permit respondent to prepare written answer (unless waived by petitioner) or to present to the court or judge issuing the writ or order testimonial or documentary evidence to establish the cause of detention as of the time for answer." GCR 1963, 712.18(2). (See 371 Mich xxv.)—REPORTER.

ciples announced in *People* v. *Hamilton* are applicable.

Defendant was arrested without a warrant at 4 in the morning of Saturday, March 27, 1954. He was not arraigned until 9 days later, on Monday, April 5th. From the time of his arrest on Saturday morning until sometime around 1 in the morning of Wednesday, March 31st, defendant was exhibited in numberless "show-ups" to victims and witnesses of unsolved robberies as well as to the widow of the victim for whose murder in her presence defendant was convicted and to another witness of the murder. During this same period of time he was interrogated by the police operating in at least 3 teams of 2 men each, some interrogating him about unsolved robberies and others interrogating him about the murder. Although the record does not disclose that defendant was interrogated on the intervening Sunday, it dramatically discloses a marathon interrogation conducted by relay teams of police officers on Saturday, Monday, and Tuesday prior to his first admission of participation in the murder sometime Tuesday evening, 3–1/2 days after his arrest. Precisely when defendant began his admissions to the police officers Tuesday evening remains clouded by the conflicting testimony of 3 of the 6 officers who participated in defendant's interrogation. One officer fixed the time of first admission at 6:30 to 7:30 p.m., while the other 2 officers testified that defendant continued to maintain his innocence to them until sometime after 10 or 10:30 that evening. He finally gave the statement admitted in evidence to an assistant prosecuting attorney at about 1 the following morning.

The People offered no evidence at the trial to explain why defendant was not arraigned on the day of his arrest nor thereafter, as a matter of fact, until 9 days later, long after his confession had been obtained. It appears from the trial record that de-

fendant was originally arrested without a warrant, not on probable cause to believe that he was implicated in a murder, but rather on probable cause to believe that he had attempted to rob a grocery store clerk carrying money from his store to a local bank. From what appears in this record the police had ample cause for arresting defendant for that offense and they then had other evidence (a witness who saw the attempted robbery and who helped police locate the car used by the robber near the scene of the robbery shortly after its occurrence, which car the police quickly determined belonged to defendant) upon which defendant could have been arraigned immediately after his arrest on the robbery charge. Why he was not then nor subsequently arraigned, in compliance with section 13 of chapter 4 of our code of criminal procedure* remains unexplained in the record made in the trial court. Absent any such showing by the People, defendant's detention without prompt arraignment violated the statutory requirement for such arraignment without unnecessary delay and deprived him, as we said in *Hamilton,* of "the process that was due him."

Our obligation to insist upon adherence to legal procedures established for the purpose of insuring

---

* CL 1948, § 764.13 (Stat Ann 1954 Rev § 28.872). Section 13, at the time of the events in this case of Walker read as it did at the time of *Hamilton* and *McCager,* as follows:

"A peace officer who has arrested a person without a warrant must without unnecessary delay, take the person arrested before the most convenient magistrate of the county in which the offense was committed, and must make before the magistrate a complaint, stating the offense for which the person was arrested."

Section 13 was subsequently repealed by PA 1961, No 44, effective May 20, 1961. As we pointed out in *People* v. *McCager, supra,* at p 119, our decision in *People* v. *Hamilton* did not rest alone upon this now repealed statutory requirement of prompt arraignment, but rested also upon Michigan's constitutional guarantee of due process found in article 2, § 16 of our Constitution of 1908, and repeated in identical language in § 17, article 1 of our Constitution of 1963: "No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law."

equality in application of fundamental rights requires that we apply the rule we announced in *Hamilton* without regard for defendant's apparent guilt or innocence. Because there was no justification shown, or even attempted, for the failure to arraign defendant without unnecessary delay after his arrest without a warrant, his detention was illegal and, therefore, the confession made by him during such detention should not have been admitted in evidence. The trial court erred in denying defendant's motion for new trial and therefore defendant's conviction should be reversed and this cause remanded for new trial.

I concur fully in Justice O'HARA's comments regarding the gross improprieties found in the briefs and appendices submitted to us in this case. Even after counsel had been advised at the oral argument of this case that defendant's motion to strike all assertions not supported in the record and the People's like counter motion had been granted, the prosecutor flagrantly repeated such misconduct in a reply brief filed after argument of the case by again referring to the defendant's criminal record which had been printed in the People's appendix and which had already been stricken by order of this Court. Such conduct deserves the censure of the Court.

BLACK, KAVANAGH, and SMITH, JJ., concurred with SOURIS, J.