FEDEROFF v MEYER WEINGARDEN & SONS, INC.

1. Witnesses—Expert Witnesses—Hypothetical Questions—Facts in Record.

A hypothetical question asked of an expert witness must be based on first-hand knowledge or on facts in the record at the time the expert gives his opinion or a combination of these two factors, but a hypothetical question may be proper unless the record is entirely barren of facts forming a basis for the question.

2. Judges—Discretion—Juries—Reading of Testimony.

Both the reading and the extent of the reading of testimony is a matter confined to the sound discretion of the trial judge when a jury requests that testimony be read back to it.

3. Negligence—Standard of Care—Reasonably Prudent Man—Customary Usage and Practice.

The standard of care by which a defendant's negligent or nonnegligent conduct is to be determined is that which a reasonably prudent man would have done under the same or similar circumstances, and the customary usage and practice of an industry is relevant evidence to be used in determining whether or not this standard has been met; such usage cannot, however, be determinative of the standard.

Appeal from Wayne, James L. Ryan, J. Submitted Division 1 March 5, 1975, at Detroit. (Docket Nos. 12977, 12978.) Decided April 23, 1975.

Complaint by Jack Federoff and Diane Federoff against Meyer Weingarden & Sons, Inc., Holmes Associates, Inc., Denis Schmiedeke, Paul Tabor

References for Points in Headnotes
[1] 58 Am Jur, Witnesses § 853.
[2] 76 Am Jur 2d, Trial § 1043.
   Right to have reporter's notes read to jury. 50 ALR2d 176.
[3] 57 Am Jur 2d, Negligence §§ 77–81.

and Patricia A. Tabor (doing business as Garden City Welding Company), Tectum Corporation, and National Gypsum Company, for damages for injuries suffered in a fall. Judgment for defendants. Plaintiffs appeal. Affirmed.

*Paul B. Newman (Markle & Markle* [by *Richard L. MacArthur]* of counsel), for plaintiffs.

*Plunkett, Cooney, Rutt, Watters, Stanczyk & Pederson* (by *William P. Cooney* and *John P. Jacobs),* for Meyer Weingarden & Sons, Inc.

*Vandeveer, Garzia, Tonkin, Kerr & Heaphy,* for Holmes Associates, Inc.

*Sullivan, Ranger, Ward & Bone* (by *Robert E. Sullivan* and *J. David Reck),* for Denis Schmiedeke.

*Conklin & Maloney,* for Garden City Welding Company.

*Davidson, Gotschall, Kohl, Nelson, Secrest, Wardle & Lynch,* for Tectum Corporation and National Gypsum Company.

Before: ALLEN, P. J., and McGREGOR and M. F. CAVANAGH, JJ.

McGREGOR, J. On September 6, 1960, plaintiff Jack Federoff, a roofer, fell while installing the roof on the Cloverlanes Bowling Alley, then under construction. As a result of the fall, plaintiff sustained a fractured vertabrae of the neck, causing paralysis, so that he is now a quadriplegic.

Plaintiff brought this action against the defendants, alleging negligence and breach of warranty. Following a 9-week trial, and after two days of

deliberation, the jury returned a verdict of no cause of action in favor of all defendants. Plaintiff's motion for a new trial was denied and he appeals as of right.

Plaintiff was an employee of the William Ewing Roofing Company, which was hired by Meyer Weingarden & Sons, Inc., the general contractor, to install the roof on the Cloverlanes Bowling Alley. The contract with Weingarden required that a "Tectum Roof" be installed by the roofer.

The Tectum roof system involved in this case operates in principle like drop ceilings, installed indoors. A set of parallel steel beams called "bulb tees", which are shaped like railroad tracks, are used to support roof panels called "Tectum tiles". The panels are placed between the bulb tees with the weight resting on the bottom flange. The Tectum panels operate as the roof, as well as the ceiling. The inside portion is painted, while the opposite side is covered with weather-proofing. After the panels are placed into position, the whole system is grouted together and becomes permanently fixed. The important advantage of this system, which is stressed by the manufacturers, is that the panels already placed into position can be walked upon while installing the remaining panels, before the system is grouted, thus saving the cost of scaffolding.

The actual shape of the roof is very complicated. The roof in the instant matter was not flat, rather, it was somewhat in the shape of a sine wave, with two high peaks on each side of a lower valley. Beams called "purlins" were placed perpendicular to these arches and the bulb tees crossed the purlins at 90° angles and ran the width of the building in an east-west direction, the same as the arches.

The bulb tees were laid by first finding the center of the purlin at its lowest point and there installing the first bulb tee. The bulb tees were then installed every two feet, going up the arch in each direction. However, at the highest point on the purlins the space left was less than two feet and it was, therefore, necessary to cut down the standard size pieces of Tectum, which measured two feet-by-four-feet, to fit in that space. The pieces which had to be specifically cut to fit were called "field cut pieces".

The procedure used in installing the Tectum panels was to lay them in the lowest part of the roof and work up the roof in an easterly-westerly direction until the crest of the arch was reached, where the field cut pieces were required. This space was left empty, as the roofers laid the regular size Tectum panels. Carpenters were hired to come along behind the roofers, cut the Tectum panels to the required size, and fill in the area next to the crest with the help of some of the roofers. This is what the plaintiff was doing, along with Harry Striz, a carpenter, at the time of plaintiff's accident.

At trial, the Tectum panels in dispute were numbered to provide a convenient means of reference. Beginning at the top of the ridge, where plaintiff and Striz were installing field-cut pieces, the field-cut piece to the east was labelled X-1. Under this row was the row of full-sized Tectum panels, which had been installed previously; the panel under X-1 was labelled X-2, and the panel west of X-2 was labelled X-3.

It is conceded that plaintiff fell while installing Tectum tiles. However, the complexity of this case arises from the fact that no one saw him fall. Plaintiff testified that he had just helped Striz cut

and install the panel numbered X-1. Plaintiff and Striz were facing in a northerly direction, and the plaintiff was standing on a regular 2-by-4-foot panel, X-2; when he stepped from that panel on to X-3 to take the next measurement, X-3 went out from under him, causing the plaintiff and the panel to fall to the ground.

Striz testified that he was not looking at the plaintiff when he fell. There is a dispute as to whether Striz confirmed plaintiff's testimony or whether he supported the view of the defendants, that the two were placing the tile next to X-1 when plaintiff fell. The defendants claim that plaintiff merely slipped through the opening next to X-1 while installing that piece of tile.

Basically, the plaintiff's claim against the defendants for breach of warranty and negligence is founded on the theory that, due to the sloping design of the roof deck and other factors, the bulb tees deflected outward, thus allowing a panel to slip through when plaintiff stepped upon it. The defendants deny that their conduct was negligent or that they breached any warranty.

Following an extremely complicated and technical 9-week trial, and after two days of deliberations, the jury returned a verdict of no cause of action in favor of all of the defendants. The plaintiff appeals as of right, raising thirteen allegations of error, only three of which merit extended discussion.

Plaintiff first alleges that the trial court erred in allowing the defense counsel to ask a hypothetical question which was based on facts not supported by the evidence, to plaintiff's expert witness, Karl Greimel. The hypothetical question was based upon the assumption that the plaintiff had stepped on X-3 to make a measurement prior to his fall, so

that when he allegedly fell through with X-3, this was the second time he had stepped on that particular panel.

Plaintiff claims that the facts and evidence did not support this hypothetical question and that he was prejudiced by this question, since under plaintiff's theory, the panel X-3 went through the first time he stepped upon it.

Both parties rely upon the testimony of Harry Striz as factual support for their respective versions of the accident. Specifically, defendants claim that Striz's testimony supports the facts upon which their hypothetical question was based. We agree.

Harry Striz was questioned at length by all the parties' attorneys. His testimony can only be characterized as confusing, at best. His responses were often ambiguous and inconsistent. Based on his testimony, both parties could, and have, emphasized responses which would support their respective positions.

While hypothetical questions to expert witnesses must be based on first-hand knowledge or upon facts in the record at the time the expert gives his opinion, or a combination of these two factors, a question is proper unless the record is entirely barren of facts forming a basis for the hypothetical question. As stated in *Durbin v K-K-M Corp,* 54 Mich App 38, 54–55; 220 NW2d 110 (1974):

> "Counsel, in propounding a hypothetical question to an expert witness, may assume any state of facts which the evidence tends to establish, and may vary the questions so as to cover and present the different theories of fact. But there must be evidence in the case tending to establish all of the facts stated in the question."

We hold that the trial judge was correct in holding that there was sufficient evidence to establish the factual basis of the hypothetical question and that plaintiff has not carried his burden of showing that any error, prejudicial or otherwise, occurred.

During its deliberations, the jury made the following request:

"It is requested that we see the transcript of Harry Striz with reference to where he was and what he and Jack Federoff were doing."

Plaintiff alleges that the trial court's denial of this request was reversible error.[1]

Initially, the trial judge refused to honor the jury's request, stating that, as a matter of law, he could not reread part of the testimony of a witness without presenting all of the record. Had the trial judge stopped at this point, it would have been reversible error. *People v Howe,* 392 Mich 670; 221 NW2d 350 (1974). However, the trial judge, after further reflection, remedied this situation the next day, by reaffirming his prior decision with the following explanation to the jury:

"With respect to the request, the court's decision was made yesterday without some degree of reflection that the request would be made. It was indicated to counsel in chambers prior to the closing argument of all the

[1] Defendants make much of the fact that the jury requested to "see the transcript". They claim that a request to get an actual copy of the transcript is highly unusual. However, this issue could not be easily disposed of on this narrow interpretation of the jury's request. In *People v Howe,* 392 Mich 670; 221 NW2d 350 (1974), the Court interpreted a jury request to be given the transcript of two witnesses as merely a request to have the transcript reread. Likewise, it is clear that, in this case, the thrust of the request was to get Harry Striz's exact testimony, whether by rereading of the transcript, or by being given an exact copy of it.

counsel, that this court is of the opinion that, generally, in a lengthy trial with a number of witnesses, complex issues, it is not wise to make available to the jury the transcript of oral testimony as distinguished from depositions received in evidence unless special and good cause is shown.

"Now, I recognize in this case, the position of this man is a most vital issue. I recognize also that the testimony of Striz can be construed in some respect as favorable to the plaintiff on that point. But I am going to decline the request because it is my opinion, in the exercise of the best discretion I can muster, it would be unfair to give the jury a transcript of any parts of this testimony unless they got all of it. I don't propose to give a transcript of the record."

When a jury requests that testimony be read back to it, both the reading and the extent of the reading is a matter confined to the sound discretion of the trial judge. *Howe, supra, Klein v Wagenheim,* 379 Mich 558; 153 NW2d 663 (1967), *People v Walker,* 371 Mich 599; 124 NW2d 761 (1963).

The case at bar is distinguishable from both *Klein, supra,* upon which plaintiff relies, and *Howe.* In both of these prior cases the trial judge erroneously refused to exercise his discretion, based upon a misinterpretation of the law. In those cases, the judges refused to reread the testimony of one witness solely because they felt that, as a matter of law, the entire record had to be reread if any part of the record was reread. In the case before us, the trial judge at first made the same error, but corrected this error the next day when he explicitly exercised his "best discretion" after thoughtfully weighing the situation.

In denying the jury's request for part of Striz's testimony, the judge stated that he recognized the importance of this testimony as well as the fact

that portions of that testimony could be construed as favorable to the plaintiff. However, as stated earlier, other portions of Striz's testimony could likewise be construed as favorable to the defendants. The trial court recognized this dilemma and decided that it would be unfair to give the jury a transcript of part of Striz's testimony unless the jury was given all of this witness's testimony.

The plaintiff's interpretation of *Klein, supra,* would strip the trial court of all discretion in this area. We do not read *Klein* nor *Howe* so broadly. In both cases, the Supreme Court acknowledged and stated the well-established general rule that such jury requests are a matter confined to the sound discretion of the trial judge. We do not interpret these cases as holding that the trial judge's discretion *must* be exercised in such a way as to grant *all* such requests in *all* cases.

The trial judge in this case presided over a nine-and-one-half week trial, the transcribed record of which constitutes 32 volumes of testimony. We join with attorneys from both sides in complimenting the judge on the excellent performance of his judicial duties. We find no abuse of discretion in his ruling on this matter.

Lastly, plaintiff alleges that the trial court erroneously instructed the jury that Holmes Associates, a distributor of the roof materials, and Tabor, the installer of the bulb tees, were not responsible for a higher degree of care than that which is the average in the industry in which they were engaged.

In *Marietta v Cliffs Ridge, Inc,* 385 Mich 364, 369–370; 189 NW2d 208 (1971), the Court stated:

"The standard by which the negligent or non-negli-

gent character of the defendant's conduct is to be determined is that of a reasonably prudent man under the same or similar circumstances. *McKinney v Yelavich,* 352 Mich 687 [90 NW2d 883] (1958). The customary usage and practice of the industry is relevant evidence to be used in determining whether or not this standard has been met. Such usage cannot, however, be determinative of the standard."

Thus, if plaintiff is correct, reversible error was committed. *Hill v Husky Briquetting, Inc,* 393 Mich 136; 223 NW2d 290 (1974).

The plaintiff cites this Court to a few lines of instructions which he claims supports his argument that the trial judge instructed that the standard of care was the "average care in the industry". However, the trial court's charge in its entirety consists of 141 pages of the transcript. It is well settled that the trial judge's charge to the jury must be considered as a whole. *Shreve v Leavitt,* 51 Mich App 235; 214 NW2d 739 (1974).

We have carefully reviewed the instructions in their entirety and find them not to be prejudicially erroneous. The trial judge emphasized to the jury that the charge at hand was extremely complex and that any rule of law stated at any particular time was undoubtedly subject to several qualifications. Thus, the judge cautioned the jury to consider the charge as a whole. The court's general negligence instruction occupied approximately eight pages of transcript and clearly explained that the standard of care was what "an ordinarily careful person" would have done under similar circumstances.

Viewing the jury instructions as a whole, we find no reversible error.

Affirmed. Costs to defendants.