## PEOPLE v. CHIVAS.

1. CRIMINAL LAW—THEORY OF DEFENSE—REQUEST TO CHARGE—INSTRUCTIONS.

It is the duty of the trial court upon proper request, to cover in the charge to the jury the theory upon which the defense is founded, if it is supported by competent evidence.

2. SAME—REQUEST TO CHARGE—EVIDENCE.

Request to charge that if jury should find another person involved in crime of robbery armed and that if involvement of such person in the crime would be inconsistent with finding defendant guilty and the whole consideration left jury with a reasonable doubt as to defendant's guilt then verdict as to defendant should be not guilty was properly refused, where there was no testimony connecting the other person with the crime (Act No. 328, § 529, Pub. Acts 1931).

3. SAME—READING OF TESTIMONY TO JURY IN ABSENCE OF DEFENDANT'S COUNSEL.

In trial for robbery armed wherein jury, during its deliberations, requested the testimony of people's witnesses, excepting two, relative to defendant's leaving the place where the holdup occurred and returning within a few minutes, it was not prejudicial error to have such testimony read to them in the presence

---

REFERENCES FOR POINTS IN HEADNOTES

[1]  53 Am. Jur., Trial, § 627.
[2]  3 Am. Jur., Appeal and Error, § 1128.
[3]  53 Am. Jur., Trial, § 940.
[4]  53 Am. Jur., Trial, § 937 et seq.
[5]  53 Am. Jur., Trial, § 454 et seq.
[6]  53 Am. Jur., Trial, § 454.
[7]  53 Am. Jur., Trial, §§ 955, 956.
[8]  15 Am. Jur., Criminal Law, §§ 473, 474.
[8]  Power of trial court to change sentence after commitment or payment of fine. 168 A.L.R. 706.
[9]  15 Am. Jur., Criminal Law, § 446.
[11]  20 Am. Jur., Evidence, § 1256.
[12]  20 Am. Jur., Evidence, § 1235.
[13]  46 Am. Jur., Robbery, § 53.

of, and after consultation with, the special prosecutor but in the absence of defendant's counsel (Act No. 328, § 529, Pub. Acts 1931).

4. SAME—READING TESTIMONY TO JURY—ABUSE OF DISCRETION.
    Where jury requested that testimony of certain of the people's witnesses be read relative to departure of defendant and subsequent return to club involved in prosecution for robbery armed, there was not an abuse of discretion in failure to read the testimony of another witness that defendant had not left the club at all (Act No. 328, § 529, Pub. Acts 1931).

5. SAME—OPENING STATEMENT BY DEFENSE.
    Defense counsel has a right to make an opening statement to the jury outlining the theory of his defense to charge of crime.

6. SAME—OPENING STATEMENT FOR DEFENSE—SEVERAL DEFENDANTS.
    It was not an abuse of discretion upon the part of a trial court in a prosecution of several defendants on charge of robbery armed in insisting that counsel for all defendants make their opening statements before witnesses for the defense were sworn and testified (Act No. 328, § 529, Pub. Acts 1931).

7. SAME—INSTRUCTIONS—COERCION OF VERDICT.
    Charge to jury, given on second day of deliberations after they had requested reading of certain testimony, which instructed them that they must deliberate upon the matters at issue with an open mind, giving due credit to the opinions of others, and that the verdict must be the individual verdict of each juror and be the result of his own convictions was not prejudicial as coercing verdict of conviction.

8. SAME—SETTING ASIDE A VALID SENTENCE.
    A trial court does not have authority to set aside a valid sentence and impose a new one after the defendant has been remanded to jail to await the execution of the sentence.

9. SAME—MOTION FOR NEW TRIAL—SENTENCE.
    A motion for a new trial which at a later date is denied does not affect the validity of a legal sentence.

10. SAME—SENTENCE—VACATING ORDER ATTEMPTING CHANGE.
    A valid sentence is not invalidated by an attempted change by the trial judge, hence, it was not error to vacate invalid order attempting to reduce the sentence.

11. SAME—BURDEN OF PROOF.
    In criminal cases the people must prove the guilt of the defendant beyond a reasonable doubt.

12. SAME—WEIGHT OF EVIDENCE.

In prosecution for robbery armed in which only evidence against appellant was that given by two witnesses involved in the crime and granted immunity, the weight to be given their testimony was for the jury (Act No. 328, § 529, Pub. Acts 1931).

13. ROBBERY—PARTICIPATION—SHARE OF PROCEEDS—EVIDENCE.

Evidence that appellant participated in holdup of club proprietor *held*, sufficient to convict defendant of robbery armed where it tended to show his participation in the holdup and receipt of a share of the proceeds of the robbery (Act No. 328, § 529, Pub. Acts 1931).

Appeal from Oakland; Hartrick (George B.), J. Submitted June 17, 1948. (Docket No. 69, Calendar No. 43,794.) Decided October 4, 1948. Rehearing denied November 12, 1948.

Sammy Chivas was convicted of robbery armed. Affirmed.

*Edward N. Barnard,* for appellant.

*Eugene. F. Black,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *H. H. Warner* and *Daniel J. O'Hara,* Assistants Attorney General, *Clyde D. Underwood,* Prosecuting Attorney, and *Lewis R. Bebout,* Special Assistant Prosecuting Attorney, for the people.

SHARPE, J. Defendant Sammy Chivas appeals from a sentence entered December 8, 1945, committing him for a minimum of 20 years and a maximum of 40 years upon a conviction of robbery armed.

The information filed August 30, 1945, charges that:

"Harry Flish, alias Flisher, alias Harry Fisher; Peter Aposteopolos, alias Pete Apostolapos, alias Pete Mahoney; Myron Selik, alias Mike Selik; William Weuburn Davidson, alias William Bradford,

alias Dunbar, alias Candy; and Sammy Chivas, * * * on or about the 2d day of December, A.D. 1944, did then and there assault one James Dades and did feloniously rob, steal and take from his person and in his presence certain money, to-wit, the sum of $270 * * * being then and there armed with certain dangerous weapons, to-wit, pistols and revolvers, in violation of the provisions of Act No. 328, § 529, Pub. Acts 1931." *

The facts deemed necessary to a decision are as follows: James Dades, the assaultee named in the information, was the operator of a club known as "The Aristocrat Club," the membership of which was largely composed of people of Greek ancestry. The club is located in a second floor apartment on South Saginaw street in Pontiac, Michigan. Entrance to the club is gained by means of a stairway from the sidewalk. The outside door of the club rooms has in it a glass which one could see through from the inside, but to a person on the outside, it appeared to be a mirror. Members of the club engaged in gambling with cards.

Dades had been acquainted with defendant Chivas for a period of seven years. Chivas had visited the club six or seven times. Approximately two weeks before December 2, 1944, Chivas, Mahoney, Fleisher and Selik came to Dades' club. They went out to a restaurant about three blocks away for a meal. After they had eaten they held a conference about raising money to get Harry Fleisher's brother Louis out of prison. Dades offered to give $500 and a diamond ring valued at $1,500. His offer was not accepted. During this conference, defendant Chivas sat at a nearby table and did not join in the conversation. During the early morning of December 2, 1944, the Aristocrat Club was entered by two men

---

* Comp. Laws Supp. 1940, § 17115–529, Stat. Ann. § 28.797.—Reporter.

who were carrying pistols and robbed Dades and other members of the club of approximately $800. The record shows that the two men who entered the club were Henry Luks and William W. Davidson, while Sammy Abramowitz remained at the door; that it was planned that the group would go from Detroit to Pontiac in two cars, one car to be driven by Fleisher and the other car to be driven by Mahoney who was to take three guns with him; that defendant Chivas would go to the club and permit the gunmen to enter as he came out.

It also appears that on the morning in question, Chivas with others hereinbefore mentioned met at Mahoney's place in Detroit at about 1 a.m., and later drove over to O'Larry's Bar and stayed there until about 2:30 a.m.; that Chivas rode out to Pontiac with Luks, Candy Davidson, Fleisher and Selik; and that when they arrived in Pontiac they parked their cars and Chivas went up to the club. He returned to the car in two or three minutes. They then synchronized their watches and arranged with Chivas to come out in five minutes; that after waiting nearly five minutes, Abramowitz went to the Mahoney car and got three guns, after which they proceeded up the stairway to the glass door. Chivas did not immediately come out and they pushed the buzzer; that Abramowitz heard Chivas talking on the inside and saying that he wanted to leave and also heard other members of the club tell Chivas that he could not go out as they did not know the men on the outside.

Having failed to gain admission, Luks, Davidson and Abramowitz decided to abandon the plan and walked downstairs. At this time one Philip Criss, a member of the club, stated he thought he knew the men and started downstairs calling to them. When Criss reached the sidewalk, Luks and Davidson grabbed him and hit him over the head with a gun. They then proceeded upstairs. As Criss reached

the top of the stairs, the door was opened from the inside and Luks followed Criss into the club rooms, then Luks announced that the place was being held up. Luks ordered the members to face the wall and asked them for the boss. When Dades responded, Luks demanded his money and diamond ring. While this was going on, Davidson was still outside. Abramowitz smashed the mirror door with his gun and then unlocked the door from the inside.

It also appears that Harry Polenis, an ex-convict, was one of several who went to the door when the robbers rang the buzzer. He did not open the door because he did not know the men outside, but when Phil Criss came up the stairs, he (Polenis) opened the door and while the robbery was going on Polenis went to a toilet at the other end of the hall and locked himself in. After the robbery, Abramowitz was taken to a hospital and treated for injuries to his arms occasioned by breaking the glass in the door.

It also appears that out of the fruits of the robbery Chivas received $150, Davidson $150 and more than $150 went to Abramowitz, while Luks retained the balance. When the cause came on for trial, Henry Luks and Abramowitz, having been granted immunity, testified in behalf of the people. Polenis also testified in behalf of the people. After the people had rested their case, Chivas' attorney requested an opportunity for further cross-examination of the witness Polenis. It developed that the witness had left the State and would be away for a few days. Chivas' attorney declined to make an opening statement until he had an opportunity of further cross-examination of the witness Polenis.

In appealing defendant Chivas urges that the court committed error in failing to give the following charge to the jury:

"The attorney for respondent Chivas has argued a belief that Harry Polenis, one of the people's witnesses, is a possible party to the crime. That is a mere theory on the part of the respondent's attorney and is a legitimate form of argument tending to create a reasonable doubt as to the respondent's own guilt. Respondent is not required to prove Polenis guilty because the burden of proof in a criminal case never shifts to the respondent. If the consideration of this argument and related testimony causes you to feel that Polenis might have been involved in the crime and that if he were involved in the crime that it would then be inconsistent to convict Chivas and this whole consideration leaves you in a position that you cannot say Chivas is guilty beyond a reasonable doubt, then your verdict should be not guilty."

Defendant urges in connection with the above that it is the duty of the court to instruct the jury on a bona fide theory of defense, when requested. The duty of the trial court in such instances is well stated in *People* v. *Hoefle,* 276 Mich. 428, as follows:

"It is the duty of the trial court, if proper request is made, to cover in the charge to the jury the theory upon which the defense is founded, if it is supported by competent testimony."

The testimony shows that Polenis was not acquainted with either Abramowitz, Luks or Davidson; that when these three men ascended the stairs, Polenis, among others, went to the door, but refused to open it as he did not know them; that as Philip Criss came up the stairs, Polenis opened the door to admit him; that after the robbers entered the club, and marched Criss into another room, Polenis rushed to the toilet and locked himself in, nor was he searched by the robber. It also appears that others in the club were not searched. We are unable to find any evidence connecting Polenis with the rob-

bery. The trial court was correct in refusing defendant's request to charge.

It is also urged that the trial court erred in having read to the jury only prejudicial portions of testimony pertaining to a certain point on which the jury requested testimony to be read. It appears that while the jury was deliberating, they submitted a request in writing as follows:

"Testimony of peoples witnesses excepting (Abramowitz and Luks) relative to Chivas leaving Dades place and returning within a few minutes."

When the jury returned to the court room, the trial court caused to be read portions of the testimony of Dades, Criss and Kocotas.

The specific complaint about the reading of this testimony is that the court did not call in both counsel to obtain suggestions as to what testimony should be read; and that consultation was had with the special prosecutor and not with defense counsel. In *People* v. *Jaskulski,* 236 Mich. 237, we held that the absence of counsel and the defendant when the jury, upon their request, were recalled and were advised about whether or not certain testimony had been stricken was not prejudicial error. In our opinion, the failure to consult counsel about what testimony should have been read to the jury was not prejudicial.

It is also urged that the testimony of Polenis should have been read to the jury as it would show that Chivas had not left the club at all before the holdup. We have in mind that the request of the jury was for testimony showing that Chivas left the club and not for testimony showing that he did not leave the club. In *People* v. *Kasem,* 230 Mich. 278, the jury returned to the court room and asked to have the testimony of a witness read to them. Counsel for defendant objected unless the testimony of two of

defendant's witnesses was also read. We there said: "To this he was not entitled as a matter of right. There was no abuse of discretion in permitting this testimony to be read." In our opinion the failure to read the testimony of Polenis was not an abuse of discretion.

It is also urged that defendant was deprived of the right to make an opening statement to the jury. It appears that at the time the people rested their case, counsel for defendant Chivas demanded an opportunity to further cross-examine the people's witness Polenis and objected to the State resting before such cross-examination had taken place. It developed that at the time Polenis was outside of the State and would be away for a few days. It also appears that Polenis had been subject to cross-examination before he left for Boston and when returned to court a few days later was cross-examined at some length.

It is fundamental law that defense counsel has a right to make an opening statement to the jury outlining the theory of his defense. In the case at bar, Chivas' counsel was invited and urged to make his opening statement. At this time, defendant's counsel had been granted the opportunity of cross-examining Polenis as soon as he returned. There was no abuse of discretion upon the part of the trial court in insisting that counsel for all defendants make their opening statements before witnesses for the defense were sworn and testified.

It is also urged that the court charged the jury in a manner calculated to coerce the verdict. The record shows that after the jury had deliberated into the second day, they requested that certain testimony be read as hereinbefore related; and that after such testimony was read the court gave the jury the following instructions:

"We have done the most we can to assist you in regard to your statement. If there are any others you should find necessary, you may request them the same as you have in this instance.

"I think, however, in order that you may give each other respectful consideration, not implying you have not done so already, but I think I should give you at least a further instruction that may have some bearing on situations of this kind, which I have given on other occasions where jurors have difficulty in reconciling their differences as to testimony and I shall do so at this time.

"The court instructs the jury that the only mode provided by our Constitution and laws for deciding questions of fact in criminal cases, is by the verdict of a jury. In a large proportion of cases, and perhaps, strictly speaking, in all cases, absolute certainty cannot be attained or expected. Although the verdict to which a juror agrees must of course be his own verdict, the result of his own convictions, and not a mere acquiescence in the conclusion of his fellows, yet, in order to bring 12 minds to a unanimous result, you must examine the questions submitted to you with candor and with a proper regard and deference to the opinions of each other. You should consider that the case should at some time be decided; that you are selected in the same manner, and from the same source, from which any future jury must be; and there is no reason to suppose that the case will ever be submitted to 12 men and women more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other. And with this view, it is your duty to decide the case, if you can conscientiously do so. In order to make a decision more practicable, the law imposes the burden of proof on one party or the other, in all cases. In the present case, the burden of proof is upon the people to establish every part of it, beyond a reasonable doubt, and if, in any part of it, you are left in doubt, the defendant is entitled to the

benefit of the doubt, and must be acquitted. But, in conferring together, you ought to pay proper respect to each other's opinions, and listen, with a disposition to be convinced, to each other's arguments. And, on the one hand, if much the larger number of your panel are for a conviction, a dissenting juror should consider whether a doubt in his own mind is a reasonable one which makes no impression upon the minds of so many men, equally honest, equally intelligent with himself, and who have heard the same evidence, with the same attention, with an equal desire to arrive at the truth, and under the sanction of the same oath. And, on the other hand, if a majority are for acquittal the minority ought seriously to ask themselves whether they may not reasonably, and ought not to doubt the correctness of a judgment, which is not concurred in by most of those with whom they are associated; and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows:

"Now, I ask you to remember the elements of the case as presented. Go over the testimony as may pertain to the various respondents in this case and try conscientiously and honestly in your own convictions and arrive at a verdict if you can conscientiously do so.

"You may retire."

The charge is made that the instructions overemphasize the idea of the necessity of a verdict at the cost of the individual opinion of the jurors.

In *Cook* v. *Vineyard,* 291 Mich. 375, the jury, after deliberating five hours, announced that they were unable to agree upon a verdict. The court instructed them that they should give further consideration to the case, saying:

"It means a good deal to both parties to have it settled, and it means something to the county to have it settled. While I don't want you to go against your own conscience, I do want you by argument with

each other to come to a conclusion as to what is just and right in this case."

Upon appeal, we said:

"The jurors were merely urged to reconcile their differences of opinion as far as they could conscientiously do so in order to reach a verdict."

In our opinion the court did not tell the jury that it was their duty to agree upon a verdict or tell an individual juror that he must give up his own views and agree with the majority. The jury was instructed to deliberate upon the matters in issue with an open mind, giving due credit to the opinions of others. The jurors were also instructed that the verdict must be the individual verdict of each juror and be the result of his own convictions. We are unable to find any coercion in the instructions given.

It is also urged that the court erred in vacating the order reducing the sentence. It appears that on December 8, 1945, following the verdict of guilty, the court imposed sentence on Chivas of a minimum of 20 years and a maximum of 40 years. On December 10, 1945, two days after sentence, commitment papers were issued. On January 5, 1946, a motion for a new trial was filed and decided on July 8, 1946. On the same day the court amended the sentence of Chivas so that the minimum was reduced to 10 years and the maximum remaining at 40 years. On September 7, 1946, the attorney general filed a motion to vacate the order reducing sentence. This motion was granted October 7, 1946. It is to be noted that on the day the motion for a new trial was denied, the trial court reduced the sentence of Chivas. The record does not clearly show whether the sentence was reduced after the motion for a new trial was denied or before it was denied. In *People v. Fox,* 312 Mich. 577, we held that a trial court was

without authority to set aside a valid sentence and impose a new one after the defendant has been remanded to jail to await the execution of the sentence. In our opinion a motion for a new trial which at a later date is denied does not affect the validity of a legal sentence. In the case at bar the original sentence was not invalidated by the attempted change.

It is also urged that the verdict was contrary to the great weight of the evidence. In criminal cases the people must prove the guilt of the defendant beyond a reasonable doubt. Defendant urges that the only evidence against defendant was that given by Abramowitz and Luks; and that this evidence should be discredited because the above witnesses were involved in the crime and were granted immunity and also because of certain discrepancies in their testimony. Citation of authority is unnecessary to establish the law that the weight to be given their testimony was for the jury.

There is evidence that approximately two weeks before the holdup Selik, Mahoney, Fleisher and Chivas came to Pontiac and talked to Dades in regard to a donation or a loan towards a fund they were raising for attorney fees; that from this conference it was learned that Dades had $500 in cash and a diamond ring valued at $1,500; that when the holdup was planned it was arranged that Chivas was to go to the club and come out at a definite time so that while he was coming out, the holdup men could enter; that on the night in question when the robbery was perpetrated, Chivas was in the club according to prearranged plans; that Chivas left the club and came down to the street and advised the holdup men as to conditions in the club; that some of the parties synchronized their watches and appeared in the stairway leading to the club at the time agreed upon; that Chivas attempted to leave the

club, but was prevented by other men because they did not know the three men outside; that during the holdup Chivas was not robbed, but did receive $150 as his share of the proceeds of the robbery.

In our opinion there is sufficient evidence, if believed by a jury, to convict defendant of the crime charged. The judgment of conviction is affirmed.

BUSHNELL, C. J., and BOYLES, REID, NORTH, and BUTZEL, JJ., concurred. DETHMERS and CARR, JJ., did not sit.