## PEOPLE v LAWSON

1. Criminal Law—Instructions to Jury—Supplemental Charge—Minority Jurors' Convictions.

   A court in its supplemental charge to the jury in order to further their deliberations in a criminal case must not make minority jurors feel that they must give up their honest convictions on the merits or tell the jury that it is their duty to arrive at a verdict.

2. Criminal Law—Instructions to Jury—Supplemental Charge—Direction to Minority Jurors—Distrust of Judgment.

   A court's direction in a supplemental charge to minority jurors to distrust their own judgment, without indicating to those in the majority that their judgment, too, may be faulty, produces a fatal imbalance in the charge; it implies precisely that the majority's judgment is better; it tends to produce an arbitrary result based upon the position taken by a majority of the jurors in a preliminary vote, rather than a reasoned result based upon the independent judgment of all the jurors on the evidence.

3. Criminal Law—Instructions to Jury—Supplemental Charge—Coercion.

   An inquiry directed to the foreman of the jury and a following supplemental charge had too great a tendency to coerce, where the court first attempted to discover the numerical division of the jury members, even though the question was never answered because of a defense counsel objection, and where the court then delivered a supplemental charge to the jury in which the jurors were told that they should distrust their own judgment if they find a large majority of the jury taking a view of the case different from their own, and where the court did not qualify its instruction sufficiently to ameliorate any coercive effect.

References for Points in Headnotes

[1–3] 53 Am Jur, Trial §§ 411–413, 759, 804.

Rule of reasonable doubt as applicable to doubt on part of individual juror. 137 ALR 394.

Appeal from Recorder's Court of Detroit, Thomas L. Poindexter, J. Submitted Division 1 June 5, 1974, at Detroit. (Docket No. 18187.) Decided October 9, 1974.

Larry Lawson was convicted of armed robbery. Defendant appeals. Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Thomas A. Ziolkowski,* Assistant Prosecuting Attorney, for the people.

*Jack J. Kraizman,* for defendant.

Before: LESINSKI, C. J., and BRONSON and VAN VALKENBURG,* JJ.

LESINSKI, C. J. The defendant, Larry Lawson, was charged with the crimes of armed robbery, MCLA 750.529; MSA 28.797, and rape, MCLA 750.520; MSA 28.788. A jury found the defendant guilty of armed robbery and not guilty of the crime of rape. The trial court sentenced defendant to a term of 15 to 25 years in prison. Defendant appeals as of right. He contends that the jury's verdict was based upon insufficient evidence and that the trial court coerced the verdict by giving a supplemental charge after the jury had deliberated for four hours.

The incident which resulted in defendant's conviction occurred on June 13, 1972 at about 11:35 p.m. The victims, husband and wife, were watching television in their home in the City of Detroit

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

when two men burst through the front door. The victims testified that one of the men, whom they later identified as defendant Lawson, held a knife on them while a second man locked the house, pulled all the blinds down, and ransacked drawers for money. The men then bound, gagged and blindfolded the husband. The second man, who was never identified, took the wife upstairs to look for more money. Once there he bound and blindfolded her and raped her. Then she was raped again by the other man, whom she said she could recognize by his voice. The men remained searching briefly for valuables, then left in the victims' car. The victims freed themselves and called the police who arrived at 12:25 a.m. Among the many articles taken by the robbers was a set of rings in the wife's purse. Two days later the police arrested the defendant and found the stolen rings in his possession. At a lineup held later, both victims identified the defendant as the first man to enter their house.

At trial the defendant presented an alibi defense. He attacked the reliability of the victims' identification by showing the discrepancies between the description which the victims had given to police after the crime and his own appearance. Notably, neither victim had indicated that their assailant wore a mustache and goatee, which defendant did at the time of his arrest. Furthermore, the defendant presented as an alibi witness Mr. Nehemiah Pitts, a counselor at the YMCA's Project Alternative, the defendant's residence on the night of the crime. Mr. Pitts testified that on the night in question the defendant was present at the Project. Mr. Pitts remembered speaking to him at approximately 11 p.m. that evening. He claimed to have seen defendant again at 11:30 at the time he made a bed-check to see that none of the residents

was absent. The counselor's log book for that evening did not indicate that the defendant had been found absent in violation of the 11:30 curfew. The defendant's evidence thus directly conflicted with that presented by the prosecution.

The defendant contends that the evidence against him was insufficient to support his conviction. The testimony of the victims alone tended to support a finding of each element of armed robbery, however, and also supported a finding that the defendant committed the crime. It was within the province of the jury to resolve the conflicts in the testimony and to render a verdict in accordance with their findings of facts.

After four hours of deliberation, however, the jury here was apparently having difficulty in reaching a verdict. At that point the trial court recalled them and the following exchange ensued:

"*The Court:* Ladies and gentlemen of the jury, I understand that you have been having some difficulty in reaching a verdict; is that correct?

"*Jury Foreman:* That's correct, your Honor.

"*The Court:* Without telling the court—without indicating how many are for one side or how many for the other side, could you give me a figure that indicates— before you answer, listen carefully because I don't want you to indicate on the record how many are one way or the other, but I want to know—could you give me just numbers that indicate so—how many are on one side and how many are on the other, without telling me how you are divided—

"*Mr. Reilly:* Your Honor, I think I have an objection —I have to object to that.

"*The Court:* All right, you have an objection?

"*Mr. Reilly:* Yes, your Honor, I think if the court wants to inquire if there is any possibility of reaching a verdict, fine, but I think I have to object otherwise.

"*The Court:* All right, I will ask that question first;

Ladies and gentlemen of the jury, do you feel that there is any possibility of reaching a verdict?

"*Jury Foreman:* I don't think so, your Honor.

"*The Court:* Well, at this time, then I am going to read you some further instructions in the case this case.

---

"*ADDITIONAL INSTRUCTIONS TO THE JURY*

"*The Court:* Members of the jury, I respectfully tell you it is necessary for the purpose of finding a verdict that all of you agree upon that verdict. In other words when I say that the verdict has to be unanimous, it has to be 12 to nothing. It is your duty, however, to agree if possible. When conferring with each other, you should pay a proper respect to each other's opinions and examine such differences in a spirit of fairness and candor. This does not mean any member of the jury shall yield his well-grounded opinions or violate his oath. It does mean he shall not stand out in an unruly and obstinate way through mere stubbornness.

"Members of the jury should always closely scrutinize the facts from their own standpoint and a viewpoint also of the fellow members of the jury.

"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conferences in the jury room.

"The very object of a jury system is to secure unity by a comparison of those views. The jury should listen with deference to arguments of fellow jurors and distrust of his own judgment if he finds a large majority of the jury taking a different view of the case from what he does himself.

"I will ask the members of the jury to think along this line.

"You understand that when you sit as a jury in the case if you are unable to reach a verdict that does not mean that the case is ended. It possibly means that at some future date a different jury will have to consider the case again at another trial.

"Now, I am going to ask you to go back and to

continue your deliberations and I will contact you again.

*"(Jury excused and return to deliberations in the jury room at 3:06 p.m.)"*

The defendant contends that the trial court committed reversible error in coercing a deadlocked jury to reach a verdict.

The first aspect of the court's action which requires scrutiny is the attempt to discover the numerical division of the jury members. Our Supreme Court has recently held such an inquiry to be reversible error in *People v Wilson,* 390 Mich 689; 213 NW2d 193 (1973). Such an inquiry, the *Wilson* court indicated, carries the improper suggestion that the numerical division at the preliminary stage of deliberation is relevant to what the final verdict will, or should, be. By establishing one viewpoint as the "majority view", the inquiry "has the doubly coercive effect of melting the resistance of the minority and freezing the determination of the majority".[1] It places the trial court's imprimatur upon what was but a tentative result. Unfortunately, the opinion in *Wilson* does not clearly indicate whether that inquiry is reversible error under every set of surrounding circumstances. Although the court explicitly rejected the view that "each case must be considered upon its own facts",[2] it seems to have relied on special facts in *Wilson* which rendered the trial court's inquiry particularly coercive.[3] In the instant case, the special facts of *Wilson* are absent. In addition, this case differs from *Wilson* in that defense counsel

---

[1] *People v Wilson,* 390 Mich 689, 692; 213 NW2d 193, 195 (1973).

[2] *Id.* at 691; 213 NW2d at 195.

[3] In *Wilson,* after the trial court learned that the jury was divided 11–1, he commented, "Well, that is not very far from a verdict." *Id.* at 691; 213 NW2d at 195.

objected to the trial court's question and the question was never answered. We do not decide whether *Wilson* requires reversal even on the facts of the instant case. However, we do recognize the coercive tendency of the court's inquiry and consider it in conjunction with the supplemental instruction given the jury, to which defendant especially objects.

After the jury foreman had stated that there was no possibility of agreement on a verdict, the court delivered a charge to the jury in order to further their deliberations. Our Supreme Court has recently ruled, in *People v Sullivan,* 392 Mich 324; 220 NW2d 441 (1974), that any such charge directed to a deadlocked jury must, subsequent to August 2, 1974, be in the form approved by the ABA Project on Minimum Standards for Criminal Justice.[4] The charge given in the instant case varies in several particulars from the ABA recommended charge, most notably in its admonition to jurors in the minority to distrust their judgment.[5] This charge, if delivered today, would surely constitute reversible error under *Sullivan,* but, because defendant's trial occurred prior to August 2, 1974, we must determine whether the charge was unduly coercive of a verdict under the law applicable prior to that date.

Supplemental instructions to a deadlocked jury have been approved in Michigan at least since *People v Coulon,* 151 Mich 200; 114 NW 1013 (1908), where the Supreme Court approved a

---

[4] ABA, Standards Relating to Trial by Jury 145–146 (Approved Draft, 1968).

[5] The nearest the ABA standard charge comes to this language is the direction that "a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous". *Id.* at 145. The standard charge, of course, directs itself to *all* jurors, not merely the minority and indicates that any verdict must be reached "without violence to individual judgment". *Id.*

judge's charge "that it might be a proper thing for a minority to consider with seriousness whether they might be wrong and a majority right; that it is probable sometimes a minority was right and a majority wrong; that no juror should yield his well-grounded convictions or violate his oath; that if upon further consideration a juror cannot conscientiously yield, of course he ought not to do so". In the following years the Court approved a number of other supplemental charges, not all of them as even-handed or insistent on the juror's duty to follow his individual conscience as the *Coulon* charge.[6] The Court has placed limitations upon what supplemental charges might be given to a divided jury, however. The rule has long been that the court must not make minority jurors feel that they must give up their honest convictions on the merits or tell the jury that it is their duty to arrive at a verdict.[7]

Although no Michigan court has measured the charge given in this case against such standards, two Federal courts have done so. In *Stewart v*

[6] *See People v Chivas*, 322 Mich 384; 34 NW2d 22 (1948); *People v Pizzino*, 313 Mich 97; 20 NW2d 824 (1945); *People v Tutha*, 276 Mich 387; 267 NW 867 (1936); *People v Hill*, 258 Mich 79; 241 NW 873 (1932); *People v Licavoli*, 256 Mich 229; 239 NW 292 (1931); *People v Digione*, 250 Mich 206; 229 NW 421 (1930); *People v Kasem*, 230 Mich 278; 203 NW 135 (1925).

The Court of Appeals has continued to approve such charges in *People v Wilder*, 51 Mich App 280; 214 NW2d 749 (1974); *People v Grace*, 50 Mich App 604; 213 NW2d 853 (1973); *People v Shelmire*, 36 Mich App 658; 193 NW2d 924 (1971); *People v Pepper*, 36 Mich App 437; 194 NW2d 67 (1971), *rev on other grounds* 389 Mich 317; 206 NW2d 439 (1973); *People v King*, 32 Mich App 167; 188 NW2d 169 (1971); *People v Bennie Jones*, 34 Mich App 667; 192 NW2d 4 (1971); *People v Coles*, 28 Mich App 300; 184 NW2d 214 (1970); *People v Coleman*, 21 Mich App 193; 175 NW2d 308 (1970).

[7] *People v Barmore*, 368 Mich 26; 117 NW2d 186 (1962); *People v Chivas*, 322 Mich 384, 395; 34 NW2d 22, 27 (1948); *People v DeMeaux*, 194 Mich 18; 160 NW 634 (1916); *People v Engle*, 118 Mich 287; 76 NW 502 (1898); *People v Coles*, 28 Mich App 300, 304; 184 NW2d 214, 216 (1970).

*United States,*[8] the Eighth Circuit found that a charge whose language closely approximated the one given in this case "so slightingly treated the positive duty of each juror to form and to make his verdict express his own honest conviction, based on the evidence in the case, and so forcibly urged deference to the views of the majority and unanimity, that we are unable to resist the conviction that it tended too strongly toward coercion of the minority of the jury to surrender their honest convictions in order to acquiesce in the convictions of the majority".[9] The Third Circuit, in *United States v Fioravanti,*[10] considered instructions precisely the same as those delivered here and found them wanting. That Court did not reverse the case before it because the charge was delivered before the jury had retired. The Court did direct that in the future "trial judges are not to give instructions * * * that direct a juror to distrust his own judgment if he finds a large majority of the jurors taking a view different from his".[11]

The *Fioravanti* Court pinpointed in its prohibition what we believe to be the most faulty segment

---

[8] 300 F 769 (CA 8, 1924). In *Stewart* the court charged the jury as follows:

"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment, or that he should close his ears to the arguments of men who are equally honest and intelligent as himself."

[9] *Id.* at 786.

[10] 412 F2d 407 (CA 3, 1969).

[11] *Id.* at 420.

of the charge in this case. The court's direction to minority jurors to distrust their own judgment produces a fatal imbalance in the charge, for it tends to weaken the judgment of minority jurors without indicating to those in the majority that their judgment, too, may be faulty. There is nothing inherently virtuous in the view momentarily held by a majority of those engaged in deliberation. To instruct the jury, for example, that "the majority will have better judgment than the mere minority" is both false and coercive of a verdict.[12] Yet telling only the minority to distrust their own judgment implies precisely that the majority's judgment is better. To influence the jury's deliberations in such a manner tends to produce an arbitrary result based upon the position taken by a majority of the jurors in a preliminary vote, rather than a reasoned result based upon the independent judgment of all the jurors on the evidence.

Nor can we say that in this case the trial court qualified its instruction sufficiently to ameliorate any coercive effect. Other charges of doubtful validity have been saved because the court reminded the jury that the verdict must be a product of their individual consciences and not a mere acquiescence in the conviction of others,[13] or because the court reinstructed them upon the burden of proof.[14] In this case the court gave no such instruction. The court did say: "This does not mean any member of the jury shall yield his well-grounded opinions or violate his oath". Yet the court followed this statement with the direction to minor-

---

[12] *Green v United States,* 309 F2d 852, 856 (CA 5, 1962).

[13] *See United States v Sawyers,* 423 F2d 1335, 1340 (CA 4, 1970); *People v Chivas,* 322 Mich 384, 395; 34 NW2d 22, 27 (1948).

[14] *People v Sullivan,* 392 Mich 324; 220 NW2d 441 (1974); *People v Chivas,* 322 Mich 384, 393; 34 NW2d 22, 26 (1948).

ity jurors to distrust their own judgment, thereby indicating to them that their opinions were not "well-grounded". The latter statement serves only to weaken the minority in their adherence to their convictions, but does not affect the majority similarly. The trial court's earlier language thus does not serve to cure the imbalance in the charge.

We find, therefore, under the applicable Michigan law that the inquiry directed to the foreman of the jury and the following supplemental charge had too great a tendency to coerce to be tolerated. Together they possessed the "doubly coercive effect" of weakening minority opinion and supporting the majority that the court found offensive in *People v Wilson,* 390 Mich 689; 213 NW2d 193 (1973). Telling jurors in the minority to distrust their judgment had the further "tendency to make the jurors feel that they must give way their honest convictions upon the merits, and agree with the majority". *People v Engle,* 118 Mich 287, 292; 76 NW 502, 503 (1898).

Reversed and remanded for a new trial.

All concurred.