# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CRAIG JOSEPH BRADLEY,

        Defendant-Appellant.

UNPUBLISHED
December 22, 2016

No. 328806
Berrien Circuit Court
LC No. 2014-016028-FC

---

Before: BORRELLO, P.J., and SAWYER and MARKEY, JJ.

PER CURIAM.

Defendant appeals by right his convictions of one count of first-degree criminal sexual conduct (CSC I), MCL 750.520b; and one count of second-degree criminal sexual conduct (CSC II), MCL 750.520c, following a jury trial. On July 2, 2015,[1] defendant was sentenced as a second-offense habitual offender, MCL 769.10, to 10 to 45 years' imprisonment for CSC I and to 75 to 270 months' imprisonment for CSC II. Defendant's sentences run concurrent to each other. For the reasons set forth in this opinion, we affirm defendant's conviction but remand for a *Crosby*[2] hearing pursuant to *People v Lockridge*, 498 Mich 358, 394; 870 NW2d 502 (2015).

## I. FACTS

This appeal arises out of CSC offenses that defendant committed against his sister-in-law who was 15 at the time of the offense. Defendant was married to the victim's older sister and the victim knew defendant for approximately seven years.

On June 28, 2014, the victim woke up at her mother's house and eventually went to a park with friends including her boyfriend. The victim testified that at the park, her boyfriend put his hands inside her pants and made physical contact with her vagina. According to the victim, her boyfriend's finger went inside her vagina, but it did not go in very deep. The victim testified

---

[1] The register of actions has an entry for "Judgment of Sentence Form" on July 2, 2015; however, the register of actions also indicates that the Judgment of Sentence was signed on July 6, 2015.

[2] *United States v Crosby*, 397 F 3d 103, 117-118 (CA 2, 2005).

that she just stood there, that she then did not like it, and that she kind of pulled back and walked away. The victim further testified that her boyfriend did that act one time, that he did not make any kind of movement, and that it did not hurt. Later that evening, the victim went over to defendant's house to go swimming. The victim testified that her sister and her nieces and nephews were at the house when they arrived.

After swimming, the victim got out of the pool and changed into her pajamas. The victim testified that it was getting dark and that she was planning on going to bed. However, the victim's niece wanted to camp outside so they put up a tent. The victim testified that she, defendant, and a niece and nephew were laying in a hammock that was in the yard. Later, the niece and nephew went into the tent. According to the victim, defendant stayed on the hammock with her and he held her hand. The victim testified that she tried to get her hand away, but that she could not because he was stronger than she was. The victim further testified that defendant then started rubbing her inner thigh with his other hand, that she was wearing shorts and a pajama shirt with slits down the side, and that she was also wearing underwear.

The victim testified that she felt like she could not move, that she did not say anything, and that defendant's hand eventually went under her shorts. The victim explained that defendant's fingers moved her underwear to the side, that defendant put his finger inside her vagina for approximately two minutes and that he moved his fingers in a circular motion. According to the victim, defendant's finger went in and out approximately five times before he started doing the circular motion, and she felt very uncomfortable. The victim testified that she felt pain that she never experienced before. According to the victim, defendant said, "Does it feel good?" when he was touching her vagina. The victim further testified that she said "no" and that her body was numb. She also testified that she felt like she could not get up or defendant would hurt her, and that defendant eventually released her hand and touched her breasts under her clothing. The victim testified that there was a sheet over her and defendant and defendant kissed her after rubbing her breasts. The victim testified that defendant kissed her on the lips and on her breasts, that her body was still numb, but that she kissed defendant back because she thought defendant would let her up if she was "sweet enough." The victim further testified that defendant eventually sucked on her nipples that he then moved down to her vagina with his mouth and that he moved her shorts and underwear over and performed oral sex. According to the victim, defendant licked her, his tongue went inside her vagina, and defendant was "down there" for approximately three minutes or less.

The victim testified that she eventually told defendant that she had to go to the bathroom and she grabbed her belongings and locked herself in the bathroom. The victim contacted a relative and the victim's father came to pick her up. According to the victim, her father asked if he should go talk to defendant, but she told him not to because she did not want the situation to get any worse than it already was. The victim testified that they then went to the Buchannan Police Department and arrived at approximately 1:00 a.m.

Officer Jerad Phillips testified that he was dispatched back to the police department at approximately 1:54 a.m. on June 29, 2014. Phillips met with the victim and her father regarding a CSC complaint. Phillips spoke with the victim alone in the interview room and he then went to make contact with the alleged suspect. Phillips testified that he spoke with defendant at defendant's home and again at the police station.

With respect to the initial contact with defendant, Phillips testified that defendant did not want to make eye contact, appeared to be shaking, was gulping really hard, and appeared to be very nervous. Phillips testified that he wanted to get a more detailed interview with defendant because defendant reported a story that conflicted with the victim's report. With respect to the second interview, Phillips testified that the interview took place at the police department. According to Phillips, defendant had a similar demeanor during the second interview and appeared to be very nervous. Phillips testified that defendant stated that he was on the hammock with the victim and the two children. Defendant told Phillips that the victim started kissing him on the neck, which led to further kissing.

According to Phillips, defendant denied sucking on the victim's nipples, denied digitally penetrating the victim, and denied the allegations made by the victim. Phillips testified that defendant reported holding hands with the victim and that defendant indicated that the victim initiated the hand holding. Phillips further testified that defendant denied touching the victim's breasts, but that defendant reported that the victim continued to adjust her body in the hammock, which caused her breast to touch his hand. According to Phillips, defendant stated that he had no sexual intentions but that his hand touched the victim's breast approximately six times as a result of the victim adjusting her body. Phillips testified that defendant indicated that he became uncomfortable after the sixth time. Moreover, Phillips testified that defendant admitted to touching the victim's inner thighs but that defendant stated that the touching was nothing sexual. Phillips further testified that defendant stated that he kissed the victim on the forehead earlier in the night.

After going to the police department, the victim went to sleep at her father's house, woke up at approximately 10:00 a.m., and called her mother to let her know what happened. The victim testified that her mother came to get her and eventually took her to the emergency room.[3] The victim testified that she changed her clothes but did not shower, bathe, or brush her teeth between the time that defendant touched her and she went to the hospital.

Maribeth Fink, a Sexual Assault Nurse Examiner, testified that she examined the victim. Fink explained that the victim's vaginal area displayed redness and was extremely tender and sore. Fink testified that she observed three crescent-shaped cuts, which were consistent with a fingernail. Fink testified that she examined the victim at approximately 7 p.m. on June 29, 2014; that the victim was still extremely tender; and that the cuts would have healed if they were caused by the victim's boyfriend, who touched the victim's vaginal area over 24 hours before the examination. Fink opined that the cuts were more recent and that the cuts were more likely to be associated with the alleged penetration that occurred at approximately midnight. Fink testified that she also collected DNA samples from the victim's nipples, left-inner thigh, and genitalia. Fink agreed that the physical injuries she observed were consistent with the history provided by the victim.

---

[3] The record is silent as to why the investigating officer did not take the minor victim to the hospital for an examination.

Ann Hunt, a forensic scientist with the Michigan State Police, performed DNA analysis with respect to the instant case. Hunt testified that she detected the possible presence of saliva on the vulvar swabs and the right nipple swabs. Hunt testified that she later received buccal swabs taken from defendant and that DNA analysis revealed that the unidentified male donor from the right nipple swab matched the DNA from defendant's buccal swab.

At an unspecified point in time, the victim was interviewed at the Child Assessment Center. The victim testified that this interview was the first time she was asked about and told someone regarding her and her boyfriend. The victim further testified that she felt pain when defendant touched her but that she did not feel the same pain when her boyfriend touched her. According to the victim, she continued to feel physical pain for approximately one month after the incident and she sought counseling. The victim testified that she did not feel like herself after the incident and that she felt like she could not trust men.

At trial, defendant testified that just he and the victim were on the hammock at one point late at night, that the victim grabbed ahold of his hand and interlocked fingers at one point in time, and that his hands were above his head rather than by his side. Defendant further testified that he had a habit of spitting. He stated that the hammock flipped over and that he "face-planted" into the grass and got a mouth full of dirt and grass. According to defendant, he subsequently spit, and the victim stated, "Oh, you spit on me." Defendant testified that the victim's outfit was inappropriate so it was not difficult for saliva to get on her when he spit. Defendant further testified that the only kissing that happened was when he kissed his son on top of the head, that the victim made a comment about not getting a kiss, and that he kissed the victim on the forehead. According to defendant, the victim then kissed him on the neck. Defendant also testified that he chewed his fingernails since he was a child so they were not sharp by any means. Defendant stated that he did not digitally penetrate or engage in oral sex with the victim. Defendant also denied that he kissed the victim's nipples. According to defendant, his hand touched the victim's thigh because they were all on the hammock together. He stated that his hand inadvertently bumped the victim's breast when she moved and he pulled his hand back immediately. Defendant was convicted and sentenced as set forth above. This appeal ensued.

## II. ANALYSIS

### i. OPENING STATEMENT

Defendant first argues that the trial court violated his constitutional rights when the trial court sustained the prosecution's objection to defense counsel presenting his position or theory to the jury during counsel's opening statement.

We review constitutional issues de novo. *People v Sledge*, 312 Mich App 516, 524; 879 NW2d 884 (2015). Unpreserved constitutional issues are reviewed for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

Following the prosecution's case-in-chief, defense counsel made his opening statement, which led to an objection from the prosecution as follows:

*Defense counsel:* Morning, ladies and gentlemen. . . . I'm gonna keep my opening statement pretty brief. [Defendant] has a sister-in-law, and her name is [the victim]. And, she'd been over to his home many times; a very close family. But back on . . . June 28th he received a phone call—text message that he was to pick her up, bring her over. She wanted to swim with [a] friend . . .; did that. Picked her up and, apparently, there was a situation involving [the victim's] boyfriend. And, you've probably heard some of it already. And he dropped him off at his home and, they swam and so on. It was—It came to later in the evening the kids were all playing in and out of that hammock. They wanted a tent; that was put up. And, apparently, [defendant] didn't know that there has been a violation of [the victim's] vaginal area. And, it's our position, our theory, that—

*Prosecution:* Well—

*Defense counsel:* —any injure—in—any—

*Trial court:* Excuse me.

*Defense counsel:* —injuries—

*Trial court:* I'm sorry.

*Defense counsel:* —that she—

*Prosecution:* I'm sorry. This is an—

*Trial court:* Hold up.

*Prosecution:* —opening statement, it's not argument. So—

*Trial court:* Right. Yeah—

*Prosecution:* —his theory—

*Trial court:* —Mis—

*Prosecution:* —his statement should be limited to what facts he's gonna prove, not what theories he wants to argue.

*Trial court:* Yeah.

*Defense counsel:* All right.

*Trial court:* [Defense counsel], this is an opening statement so the—

*Defense counsel:* Okay.

*Trial court:* —the object is to tell them what you intend to prove.

*Defense counsel:* Thank you, your Honor.

*Trial court:* Or disprove, through your—

*Defense counsel:* Right.

*Trial court:* —evidence.

*Defense counsel:* Thank you for that, judge.

Subsequently, defense counsel continued his opening statement and gave a preview of defendant's expected testimony. On appeal, defendant argues that the court erred in sustaining the prosecutor's objection such that it resulted in a denial of his constitutional rights.[4]

In a criminal trial, a defendant has a state and federal constitutional right to present a defense.[5] *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002). Part of that right includes the right to present an opening statement to the jury: "[i]t is fundamental law that defense counsel has a right to make an opening statement to the jury outlining the theory of his defense." *People v Chivas*, 322 Mich 384, 392; 34 NW2d 22 (1948); see also *Hampton v United States*, 269 A2d 441 (DC, 1970) (noting that "in a criminal case tried to a jury the defendant has the right to make an opening statement. . . .")

The Michigan Court Rules govern the procedural aspects of an opening statement; specifically, MCR 2.507(A)[6] provides:

> Opening Statements. Before the introduction of evidence, the attorney for the party who is to commence the evidence must make a full and fair statement of that party's case and the facts the party intends to prove. Immediately thereafter or immediately before the introduction of evidence by the adverse party, the

---

[4] The prosecution argues that defendant waived this issue when trial counsel stated "Okay" and "thank you, your Honor," and continued with his opening statement after the trial court sustained the prosecution's objection. We reject this argument. These statements were part of an ongoing opening statement made mid-stream by defense counsel; it did not amount to an "intentional relinquishment or abandonment of a known right." *People v Vaughn*, 491 Mich 642, 663; 821 NW2d 288 (2012) (quotation marks and citations omitted).

[5] Defendant characterizes this right as a Sixth Amendment right to a jury trial; however, the opening statement is part of the defense's overall defense, it implicates defendant's constitutional right to present a defense, *Kurr*, 253 Mich App at 327, as opposed to his right to a jury.

[6] Under MCR 6.001(D), "the rules of civil procedure apply to cases governed by [Chapter 6: Criminal Procedure], except (1) as otherwise provided by rule or statute, (2) when it clearly appears that they apply to civil actions only, or (3) when a statute or court rule provides a like or different procedure."

attorney for the adverse party must make a like statement. Opening statements may be waived with the consent of the court and the opposing attorney.

Similarly, MCR 2.513(C) provides:

Opening Statements. Unless the parties and the court agree otherwise, the plaintiff or the prosecutor, before presenting evidence, must make a full and fair statement of the case and the facts the plaintiff or the prosecutor intends to prove. Immediately thereafter, or immediately before presenting evidence, the defendant may make a similar statement. The court may impose reasonable time limits on the opening statements.

In this case, the trial court clearly erred in sustaining the prosecutor's objection and in preventing counsel from presenting a "theory" or "position" to the jury; defense counsel had a right to present his theory of the case to the jury. *Chivas*, 322 Mich at 392. There is nothing in the court rules that bars defense counsel from advancing their client's theory or position to the jury during an opening statement. Similarly, the prosecution does not cite any case law to support the proposition that counsel is barred from presenting a theory or a position to the jury during opening statements. Indeed, during his opening statement in this case, the prosecutor made statements that amounted to the presentation of the state's theory or position to the jury. To now argue that such avenue of argument is available to the State but not the defendant is, at best, disingenuous. Rather, case law makes clear that the presentation of a defense theory or position is part and parcel of a defendant's right to present an opening statement to the jury, which is part of a defendant's broader overall right to present a defense. *Chivas*, 322 Mich at 392. Thus, the trial court clearly erred in ruling otherwise.

Although the trial court erred in sustaining the prosecution's objection, the trial court's erroneous ruling did not deprive defendant of his right to present a defense. The record reveals that defense counsel gave an opening statement after the prosecution's case-in-chief. Defense counsel gave a brief summarization of the background information and explained what defendant's anticipated testimony was going to be, i.e., that there was no inappropriate touching, no penetration, and no use of force or coercion. Defense counsel concluded by noting that defendant was going to ask the jury to return a not guilty verdict on both counts. Moreover, it appears that when the trial court sustained the prosecutor's objection, defense counsel was going to argue that the victim's boyfriend caused the injuries—a theory that defense counsel was able to advance during closing argument. Therefore, given that defense counsel was afforded the opportunity to present an opening statement, and, essentially advance his case during both the opening statement and closing argument, we cannot conclude, in this case, that the trial court's erroneous ruling deprived defendant of his constitutional right to present a defense. *Kurr*, 253 Mich App at 327; *Carines*, 460 Mich at 763-764.

## ii. RIGHT TO TESTIFY

Next, defendant argues that he was denied the right to testify when, during his testimony, the trial court sustained the prosecution's objection to defendant's characterization of Officer Phillip's testimony.

We review for an abuse of discretion the trial court's evidentiary rulings that have been properly preserved. *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008). Preliminary questions of law are reviewed de novo. *People v Pattison*, 276 Mich App 613, 615; 741 NW2d 558 (2007). An erroneous evidentiary ruling does not require reversal unless it affirmatively appears that it is more probable than not that the error was outcome determinative. MCL 769.26; *People v Lukity*, 460 Mich 484, 488, 495-496; 596 NW2d 607 (1999). To the extent defendant raises a constitutional issue, we review unpreserved constitutional issues for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763-764.

During defendant's case-in-chief, defendant testified regarding Officer Phillips's report, which drew an objection from the prosecution as follows:

> *Defendant:* Yeah. And the way [Officer Phillips] worded it was not the way I said in the police report. But as you heard, he changed the transcript, and—
>
> *Defense counsel:* Would you—
>
> *Defendant:* —we've—
>
> *Defense counsel:* —please—
>
> *Prosecution:* Well, objection—
>
> *Trial court:* Excuse—
>
> *Prosecution:*—to that.
>
> *Trial court:* —me. I'm sorry, what?
>
> *Prosecution:* Number one, there's not a transcript. Number two—
>
> *Defendant:* Or his notes, whatever they were.
>
> * * *
>
> *Prosecution:* Judge, the objection was his characterization of what the officer testified to. There was no testimony that he changed anything; made notes, put it in the report, here we are. He's insinuating that there was some—
>
> *Defendant:* He said he dictated it to somebody else, is what he said in his re—testimony.
>
> *Trial court:* Excuse me. I'm gonna tell you this one more time, [defendant]. I'm trying to listen to counsel. Don't be interrupting our dialog. . . .
>
> * * *
>
> *Trial court:* The objection is sustained.

-8-

*Defense counsel:* Thank you, your Honor.

On appeal, defendant argues that, in sustaining the objection, the trial court denied him the right to testify in his own defense. "The right to testify on one's own behalf in a criminal proceeding is . . . a right implicit in the Constitution." *United States v Dunnigan*, 507 US 87, 96; 113 S Ct 1111; 122 L Ed 2d 445 (1993). However, "the right to present relevant testimony is not without limitation" and "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Rock v Arkansas*, 483 US 44, 55; 107 S Ct 2704; 97 L Ed 2d 37 (1987) (quotation marks and citation omitted). "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id*. at 56 n 11 (quotation marks and citation omitted). However, the "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." *Id*. at 55-56. In other words, "procedural and evidentiary rules controlling the presentation of evidence do not offend the defendant's right to testify unless such rules are arbitrary or disproportionate to the purposes they are designed to serve." *United States v Orozco*, 764 F3d 997, 1001 (CA 9, 2014) (quotation marks and citation omitted).

MRE 611(a) provides:

> (a) Control by Court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation *effective for the ascertainment of the truth*, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment. [Emphasis added.]

Here, Officer Phillips testified that he took notes, that the notes were dictated, and that the notes were destroyed after his report was completed. In reference to Officer Phillips's testimony, defendant testified, "But as you heard, he changed the transcript," and the prosecution objected to defendant's mischaracterization of Officer Phillips's testimony. The trial court sustained the objection. Indeed, defendant mischaracterized Officer Phillips's testimony, and MRE 611(a) gives the trial court authority to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . make the interrogation and presentation effective for the ascertainment of the truth . . . ." MRE 611(a). Here, there was no factual basis to support defendant's assertion that Officer Phillips acknowledged that he "changed the transcript." Thus, preventing defendant from mischaracterizing another witness's testimony made the presentation of evidence effective for the ascertainment of the truth and was within the trial court's authority under MRE 611(a). Accordingly, the trial court did not abuse its discretion when it sustained the prosecutor's objection and defendant has not shown that an error occurred. *Franklin*, 298 Mich App at 542; *Carines*, 460 Mich at 763-764.

Moreover, defendant has failed to show that the evidentiary ruling deprived him of the right to testify. Defendant did, in fact, testify in this case and was not completely barred from exercising his right. However, as noted above, "the right to present relevant testimony is not without limitation" and "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Rock*, 483 US at 55.

For the foregoing reasons, the trial court did not deny defendant the right to testify on his own behalf. See *id.* at 55-56, 56 n 11. Similarly, defendant has not established plain error. *Carines*, 460 Mich at 763-764.

### iii. *LOCKRIDGE*

Finally, defendant argues that the trial court violated his Sixth Amendment right to a jury when it used judicially found facts to score OV 3, OV 4 and OV 10 that increased his guidelines recommended minimum sentencing range. The prosecution does not dispute that the trial court engaged in judicial fact finding and that defendant is entitled to a *Crosby* remand pursuant to *Lockridge*, 498 Mich at 358. Accordingly, because there is no dispute that the court engaged in judicial fact finding to score the OVs, and because those facts established the guidelines' minimum sentencing range, when the court proceeded as if it were constrained to the sentencing range, "an uconstitutional constraint [on the judge's discretion] actually impaired the defendant's Sixth Amendment right," *id.* at 395, and defendant is entitled to a *Crosby* remand.

We note that the *Lockridge* Court provided the following guidance for Michigan circuit courts on *Crosby* remands:

> Thus, in accordance with [*Crosby's* ] analysis, in cases in which a defendant's minimum sentence was established by application of the sentencing guidelines in a manner that violated the Sixth Amendment, *the case should be remanded to the trial court to determine whether that court would have imposed a materially different sentence but for the constitutional error.* If the trial court determines that the answer to that question is yes, the court shall order resentencing. [*Id.* at 397 (emphasis added).]

With respect to the specific procedure on a *Crosby* remand, this Court has explained as follows:

> [O]n a *Crosby* remand, a trial court should first allow a defendant an opportunity to inform the court that he or she will not seek resentencing. If notification is not received in a timely manner, the court (1) should obtain the views of counsel in some form, (2) may but is not required to hold a hearing on the matter, and (3) need not have the defendant present when it decides whether to resentence the defendant, but (4) must have the defendant present, as required by [MCR 6.425], if it decides to resentence the defendant. Further, in determining whether the court would have imposed a materially different sentence but for the unconstitutional constraint, the court should consider only the circumstances existing at the time of the original sentence. [*People v Stokes*, 312 Mich App 181, 198; 877 NW2d 752 (2015) (quotation marks and citations omitted).]

In sum, because defendant's sentence was imposed in violation of the Sixth Amendment, we remand to the trial court for a *Crosby* hearing.

We affirm defendant's conviction and remand for further proceedings consistent with this opinion.  We do not retain jurisdiction.


/s/ Stephen L. Borrello
/s/ David H. Sawyer
/s/ Jane E. Markey